**STATE of Minnesota, Respondent,**

v.

**Gary Bruce FOSSEN, Appellant.**

**No. 48759.**

Supreme Court of Minnesota.

May 18, 1979.

Meshbesher, Singer & Spence, Ronald I. Meshbesher and Carol Grant, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert W. Johnson, County Atty., and Edwin M. Wistrand, Asst. County Atty., Anoka, for respondent.

Heard before PETERSON, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

## OPINION

SCOTT, Justice.

This is an appeal from a judgment of conviction of three counts of second degree murder entered by the district court in Anoka County after a jury trial on an indictment which charged defendant with three counts of first degree murder for the shotgun slayings of his father, mother, and sister. The judgment provided that three indeterminate sentences of 0 to 40 years be served concurrently. We affirm.

At the time of the shootings, defendant lived in the upstairs area of his parents' house, located on Highway 10 between the cities of Anoka and Elk River. His parents, Leroy and Muriel Fossen, lived on the main floor of the home, and his sister Linda, her husband and small child lived in the basement. Defendant's brother, Keith, who was temporarily separated from his wife, stayed in the attached garage, which had been remodeled into a family room with a loft bedroom. Defendant, Leroy, Muriel, and Keith all worked in the family-owned automobile body shop located a short distance from the Fossen home. Immediately

adjacent to the Fossen body shop was the Louis M. Graves Company, a woodworking shop.

At about 7 p. m. on February 25, 1976, defendant ran into the Graves shop, where a number of people were working. He was screaming and shouting uncontrollably, and was incoherent much of the time. According to Jan Yahnke, defendant's girlfriend, who was probably closest to defendant when he ran into the shop, she thought he said, "Somebody shot Mom and Dad" or, "I shot Dad." James Graves and fellow employees Keith Miller, David Wagner and Donald Munsterman all testified that they heard defendant say something to the effect that "somebody shot my mom and dad, call the police." [1]

While Yahnke phoned the police, Graves, Munsterman and another Graves employee, Frank Moody, walked with defendant to the rear door of the Fossen home. Moody remained with defendant outside the house while Graves and Munsterman went briefly inside the home. The door they entered was tightly shut. Upon entering the house, Graves and Munsterman smelled the odor of burned gunpowder. They saw the bodies of Leroy, Muriel, and Linda, and without touching anything went back outside. Munsterman testified that he was in the home for 10–15 seconds and observed that the front door to the house was open. Graves did not see the front door of the home and thus did not observe whether it was ajar. Keith Fossen, defendant's brother, testified that in December 1974 there had been a draft under the front door of the home so Muriel Fossen caulked and sealed the door shut, locked it from the inside, and attached a note to the outside of the door directing visitors to enter by way of a side entrance. Keith also stated that two days after the shootings he noticed that the front door was not locked shut.

The first police officer to arrive on the scene, Officer Dale Anderson of the City of Ramsey Police Department, upon entering the home observed that the front door was shut. Similarly, four other police officers who arrived thereafter testified that the front door was closed.

Linda's body was found lying on the living room floor near the doorway to the kitchen. She had been shot twice, once in the right arm and once in the right breast, the latter shot penetrating her heart. Muriel's body was discovered slumped in a living room chair. She had been shot once in the abdomen and once in the heart. Leroy's body was found lying on the kitchen floor to the right of the doorway between the kitchen and living room. A shotgun was lying on top of his body. He had been shot twice. One shot struck the side of his chin and passed through the muscle wall of the chest, exiting below his left armpit. The other shot shredded his trachea and esophagus and struck an artery, causing him to bleed to death within 2 to 5 minutes. A seventh shot was fired into the base of the stairway, located near Leroy's body, which led to the second floor. The hole left by this seventh shot was 19 inches from the floor, with a slightly upward trajectory.

Agent James Bollenbach of the FBI examined the seven spent shell casings and testified that six of the seven had, to the exclusion of all other weapons in the world, been fired by the shotgun found lying on Leroy's body. He stated that the seventh casing did not have sufficient microscopic characteristics for identification purposes, but noted that the firing pin mark on the casing was the same size and shape as that produced by the shotgun found on Leroy's body.

Dr. Jerome Harty, a pathologist who performed the autopsies on Leroy and Linda, testified that, based on various factors such as the angle of the shots and the distance of the shotgun from Leroy's face when it was fired at him, it was not possible for Leroy's wounds to have been self-inflicted. Leonard Christ, an investigator for the Anoka County Crime Unit, also indicated in his

---

1. As is pointed out by the state's brief, defendant did much excited talking while he was in the woodworking shop, and therefore the state-

ments attributed to him by witnesses are not mutually exclusive.

testimony that in his opinion Leroy did not commit suicide. Dr. Harty stated that Linda was trying to protect herself and had her arms in the air when the shots were fired at her, and Dr. Richard Lynch, who performed the autopsy on Muriel Fossen, testified that Muriel's wounds were not self-inflicted.

Dr. Harty also stated that Leroy's face was bruised and one of his teeth was chipped, and that these injuries could have been caused by a fist or a gun butt. The day after the shootings, defendant had no fresh marks or bruises, although the general condition of his body, particularly his chest, was very flushed. Two blue buttons, one with a piece of thread attached to it, were found in the kitchen of the Fossen home. Examination of the shirt worn by defendant on the evening of the shootings showed that two buttons had been torn from it, causing the fabric to rip. Agent James Frier of the FBI testified that the buttons and thread found on the kitchen floor were identical to the buttons and thread on defendant's shirt.

In a small office area near the side entryway of the house, papers were found scattered on the floor. The drawers of a desk situated in this area were not open. Keith Fossen testified that the only item missing from the house was a 20-gauge shotgun. The evidence disclosed that the Fossen family owned numerous rifles and shotguns. In defendant's upstairs bedroom the police found an empty gun case lying open in the bedroom closet. Keith Fossen testified that he owned the shotgun found lying on Leroy's body, but that defendant had used the weapon on occasion. Keith also stated that after he and defendant went hunting in the fall the shotgun in question, as well as other guns, was brought up to defendant's bedroom. Keith did not know if the shotgun had subsequently been taken out of defendant's bedroom.

Agent David Larrabee of the FBI examined the shotgun and shells in question for fingerprints. He found no latent prints on these items which would be valuable for identification purposes. Agent Larrabee stated, however, that in his experience he had recovered identifiable prints from objects only about 40 percent of the time.

Agent John Riley of the FBI examined decedents and defendant for gunpowder and primer residue to determine whether any of them had fired a gun. These tests proved inconclusive. Agent Riley stated, though, that if a person's hands are washed after firing a gun the primer residue does not remain on the individual's hands. Detective Russell Hanson, an investigator for the Major Crime Unit of Anoka County, testified that on the night of the shootings defendant used the bathroom in the Fossen body shop and washed his hands. Agent Riley stated that the victims of the shootings had large amounts of primer residue on their hands, which he concluded had been deposited there by the muzzle blast from a shotgun. Agent Bollenbach found gunpowder residue on the clothing of all three victims, but found none on defendant's clothes. He testified that he did not expect to find any gunpowder residue on defendant's clothing. Agent Riley at first testified that anyone in the house at the time the shots were fired would "very likely" be contaminated with large amounts of primer[2] and gunpowder residue, later changing this likelihood to "possible."

Defendant and decedents were also examined for blood stains and spatters. Muriel and Linda had type B blood and Leroy had type O. The front of defendant's clothing was stained with type O blood (defendant claimed that he had knelt down to hold his father, who was bleeding profusely). Leroy, in addition to being soaked with his own type O blood, had type B blood on the soles of his shoes and two spots of type B blood on his pants. Defendant's expert witness, Herbert MacDonell, testified that he would have expected that at least Linda's blood would have backspattered onto the assailant's clothing. There was evidence of

2. Defendant's clothing was apparently not examined for primer residue because, according to Agent Bollenbach, the test is not reliable.

blood spattered throughout the living room and onto Leroy. Dr. John Coe, the Hennepin County Medical Examiner, testified that in his experience he had observed the backspatter of blood only where there were head or contact wounds, and had never seen blood backspatter where wounds to soft tissues were not contact wounds.

There was also much evidence at trial as to statements made by defendant on the night of the shootings. According to James Graves' testimony, on the way back to the house from the woodworking shop defendant told Graves that before his father died he told defendant that "somebody in a brown car had done it." Don Munsterman also stated that defendant told him that "Leroy mentioned something about a brown car." Frank Moody testified that defendant told him that Leroy said to defendant, "It's a brown car, get 'em."

Officer Dale Anderson stated that when he first arrived defendant said, "Dad said it was a brown car, get the brown car." Detective Richard Thompson, of the Major Crime Investigation Unit of Anoka County, testified that defendant told him that Leroy spoke to defendant twice regarding the brown car, once when defendant first discovered Leroy in the house and again after defendant attempted to remove the shotgun from Leroy's body, causing it to discharge into the wall. Allegedly, the second statement made by Leroy to defendant was, "They're getting away in a brown car, get 'em." Detective Thompson testified that he was sure these were the exact words defendant told him Leroy had used. Detective Thompson also stated that he had taken the statement down verbatim as related to him by defendant. Soon thereafter, about 7:45 p. m. on the night in question, Detective Russell Hanson, also an investigator for the Major Crime Unit of Anoka County, talked to defendant in one of the squad cars. Since defendant was so upset, Hanson found it difficult to take notes, and therefore decided to tape record his conversation with defendant. The tape recording was introduced at trial by the prosecutor and was admitted as a court exhibit. It was played one time during the trial to the

jury, but the jury was not allowed to take the tape into the jury room. In a part of the recorded statement defendant said, " * * * he [Leroy] said something about, I could hardly understand him, but it was like it sounded like a 'brown car' and then he just slumped into my arms * * *."

Dr. Harty, the pathologist who performed the autopsy on Leroy's body, testified that because of the terrible damage to Leroy's trachea caused by the shotgun blasts, it would have been, in Dr. Harty's opinion, impossible for Leroy to speak. On cross-examination Dr. Harty was asked by defendant's counsel whether he held that opinion "beyond a reasonable doubt," and Dr. Harty answered that he did. He stated, however, that it would have been possible for Leroy to mouth words and make gurgling noises.

Also in the recorded statement, defendant said that when he tried to remove the shotgun from Leroy's body it fired into the wall by the stairway. He went up that stairway to the second floor and then exited "down the back stairs." When he was halfway down the stairs, he said, he could see "red lights flashing" between the campers parked along the side of the Fossen house. To defendant, they looked like tail lights. Defendant attempted to follow the lights in his pickup truck, but the traffic made it impossible for him to determine which car to follow. He returned to the house, went up the back stairs, apparently to his room, then went downstairs and exited "out the back."

Leonard Lombard, the owner of the campers parked near the Fossen home at the time of the shootings, testified that due to the height of the campers and the distance between them it would not have been possible to see from the rear steps of the Fossen home between the campers. On the day after the killings, Detective Hanson returned to the Fossen house to investigate Fossen's statements regarding the tail lights. He walked between the row of campers and the building in which Lombard had his camper business (presumably any car whose lights might have been observed

by defendant would have driven along this route). Hanson stated that, looking back to the Fossen house, he could not see any portion of the back stairway which defendant said he ran down when he saw the tail lights. Defendant attempted at trial to introduce testimony from Keith Fossen and Vince Carraher, a private investigator, relating to whether it was possible to see tail lights from the back steps of the Fossen home. The trial court excluded this evidence for lack of foundation.

After defendant gave his recorded statement to Detective Hanson he went to a local Holiday Inn with Jan Yahnke for the evening. Yahnke testified that on that night and the following day defendant did not talk about the deaths of his parents and sister, nor did he discuss funeral arrangements. She stated that defendant talked about the family business, including what he wanted to do with it. On the day after the shootings, apparently after the pathologist had determined that Leroy would not have been able to speak, and also apparently after the investigation of whether tail lights could be seen from the Fossen back stairway, defendant was arrested and charged with murder.[3]

Evidence was introduced at trial regarding defendant's relationship with Yahnke, who had lived with defendant in his upstairs apartment in the Fossen home for about the first two weeks in January. On January 18, after an argument, defendant called the authorities to have her evicted. That same evening, she returned to his apartment. Defendant had been drinking and taking pills. Yahnke testified that when he saw her he fell to the floor, beating his hands and weeping uncontrollably. According to Yahnke, defendant told her that he "couldn't take it any more," that he was getting pressure from his parents and friends, and that he felt emotionally threatened by her. Yahnke testified that she and

defendant had another argument after defendant and his mother arranged for Yahnke to have a pregnancy test without her knowledge. Muriel had scheduled an appointment with a gynecologist for Yahnke, which Yahnke believed was for treatment of a vaginal yeast infection. In addition to treatment for the infection, Yahnke was given a pregnancy test. She testified that at that time she had not engaged in sexual intercourse with defendant. After Yahnke confronted defendant about the pregnancy examination, he told her that he was confused, that he had talked to his mother, and that he and his mother had decided that she should be tested.

In response to questions asked by defendant's counsel, Yahnke agreed that the relationship between defendant and his mother was "extremely close" and "very close and loving." She also agreed that defendant "almost worshipped his mother." The closeness of this relationship for a man of defendant's age (28) struck Yahnke as being unusual. She stated, however, that defendant's relationship with his mother did not cause any problems in the relationship between herself and defendant.

Defendant's brother, Keith, stated that defendant's relationship with his mother was "[v]ery close, very loving," and he explained that Muriel and defendant liked to do things together, such as going to the library in the evenings. Defendant and his sister Linda also had a close relationship.

Yahnke testified that defendant told her that he and his father did not get along and that Leroy used to beat him very badly when he was a young child. Keith described his father as being " * * * hot and cold. He was a different type of person. He was hard to get close to and we [he and his father] fought sometimes and argued * * *." Keith indicated that defendant had the same kind of relationship with Leroy. Both Yahnke and Keith testified that a

---

3. It should be noted that some statements made by defendant to police officials after his arrest were suppressed at an omnibus hearing on the ground that defendant was not advised of his right to have an attorney present during questioning. The trial court's suppression order was affirmed by this court in *State v. Fossen*, Minn., 255 N.W.2d 357 (1977). The possibility, however, that these statements would be used to impeach defendant had he testified in his own behalf was apparently the reason for defendant's not testifying at trial.

few times after Leroy and defendant quarreled Leroy would fire defendant as an employee of the family business but Muriel would hire defendant back. James Graves states that the work relationship between defendant and Leroy varied from "super to very poor." Two other witnesses testified that they had observed defendant and Leroy argue.

Keith testified that for about six months prior to the shootings Muriel and Leroy had "some serious marital problems." Muriel had threatened to leave her husband and had also prepared divorce papers. Muriel and Leroy had argued on the day of their deaths.

Yahnke testified that she saw defendant at about 5:30 or 5:45 p. m. on the night of the shootings and that he was in a very good mood. Don Munsterman saw defendant at about 5:40 that evening and they joked back and forth. Defendant had asked Munsterman to move his pickup from the front of the Fossen body shop driveway so defendant could drive his car into the shop to fix his car radio. Keith Miller and David Wagner (Graves employees) testified that they saw lights on in the shop at 6:30 p. m., but did not see if anyone was in the building.

The following issues are presented in this case:

(1) Did the prosecutor's comments during final argument improperly suggest to the jury that defense counsel was guilty of wrongdoing in presenting his case?

(2) Did the prosecutor prejudice defendant's right to a fair trial by eliciting testimony regarding defendant's sexual relationship with his girlfriend, by his comments during final argument regarding defendant's relationship with his mother, and by his remarks during final argument relating to a possible motive for the killings?

(3) Did the trial court err by not allowing defense witnesses to testify regarding experiments conducted at the Fossen home?

(4) Did the trial court err by not allowing defendant's tape-recorded statement into the jury room?

(5) Is the evidence sufficient to support the jury's verdict?

(6) Did the trial court err by instructing the jury that defendant's not-guilty plea was not evidence of his innocence?

■ 1. Whether the prosecutor acted improperly in his final argument to the jury [4] is largely a matter within the sound discretion of the trial court. As this court stated in *State v. Johnson*, 277 Minn. 230, 235, 152 N.W.2d 768, 772 (1967), cert. denied, sub nom. *Johnson v. Minnesota*, 390 U.S. 990, 88 S.Ct. 1190, 19 L.Ed.2d 1297 (1968):

"Whether or not the statements made during the final argument are so prejudicial and inflammatory as to amount to misconduct is normally decided by the trial judge in the exercise of his discretion. See, *State v. Guevara*, 270 Minn. 356, 133 N.W.2d 492. Ordinarily the trial judge is in the best position to appraise the effect on the jury of the conduct complained of."

Here, the trial court concluded, in its rulings and post-trial memorandum, that the state's attorney did not act improperly during his final argument. Upon review of the entire record, we believe that the trial court's determination is soundly based and thus its decision will not be disturbed on appeal.

Defendant's primary contention regarding the prosecutor's remarks during closing argument is that the state's attorney insinuated that defendant or his counsel had tampered with evidence. The remarks in question arose as a result of a conflict in evidence over the cartridge capacity of the purported murder weapon. Agent Bollenbach claimed that it could hold only three shells, while Herbert MacDonell, the defense expert, testified that the shotgun could hold four cartridges. This evidence

---

4. See, *State v. Thomas*, 305 Minn. 513, 232 N.W.2d 766 (1975), for closing argument standards applicable to prosecution and defense.

had no real bearing on the substantive issues at trial; however, it does serve to impeach the state's witness.

The alleged improper comments of the prosecutor read as follows:

"* * * Now, Bollenbach looked at this gun, first, when we recovered it. We sent it to the F.B.I. After that, pursuant to the Rules of Criminal Procedure in this State we gave it to the Defense and they looked at it. When they brought it back, it held four and I cannot account for that. *The gun was not in control of the State and I don't know what happened.* I do know that if you look at Defendant's Exhibit WW [demonstration shells], the Defense witness made these himself, and that he did get four of them in the shotgun. I saw it, too, and they are soft on the end, at least one of the corks is pushed part way down into the shell itself." (Emphasis added.)

Later, the prosecutor again commented:

"Now, the Defendant wants you to believe that Agent Bollenbach was wrong about the number of shells that the gun would hold and, therefore, Agent Bollenbach must be wrong about his comparison of the firing marks left on the shells. First of all, it's not necessary that Agent Bollenbach was wrong. *The gun could have changed.*" (Emphasis added.)

In chambers, after the close of the prosecutor's final argument, defense counsel claimed that the prosecutor had accused defendant and/or his counsel of tampering with the shotgun. In response, the trial court stated, "I didn't glean from his statements that he was accusing you or your expert of impropriety. It was an interpretation of fact against a fact both adduced by expert testimony." The trial court, nevertheless, gave the jury the following cautionary instruction:

"I instruct you that there is no evidence in this case that State's Exhibit No. 10, the shotgun, was in any way tampered with and any argument of Counsel implying that should be disregarded by you."

The prosecutor's comments could, arguably, be viewed as insinuating that the shotgun had been tampered with by defendant, his attorney, and/or the defense witness. However, we believe that the court's decision regarding the effect of the prosecutor's comments is reasonable under the circumstances and thus not an abuse of discretion. Moreover, any prejudice suffered by defendant as a result of the prosecutor's remarks would have been rectified by the trial court's cautionary instruction.

■ Defendant's second accusation of prosecutorial impropriety relates to defense counsel's cross-examination of Undersheriff Donald Dwyer. Defendant attempted at trial to show that some intruders had entered through the front door of the Fossen home and committed the murders. Although one witness testified that he saw the front door open after the bodies were discovered, every other witness who saw the door, including Dwyer, stated that it was shut. In an apparent attempt to support his theory that intruders had committed the murders, defense counsel cross-examined Dwyer as follows:

"Q. Had it snowed recently, do you know?

"A. No, it had not snowed recently because there was a lot of—it was dirty. It was a dirty February evening. It was rather warm, I think rather humid and I have checked recently the temperatures and they were in the low 40's during that evening.

* * * * * *

"Q. But there was snow on the ground, wasn't there?

"A. Yes.

"Q. And did you notice if there were *any footprints on the front steps going to the front door?*

"A. It was a very trampled area. I did not specifically notice myself whether there was snow on those steps or whether there were footprints in the snow, no.

"Q. Presumably if there was a sign directing people away from that front door, *you wouldn't expect any footprints on those steps, would you?*

"A. Unless they were coming, I suppose, or going up to the house or out of the house. I don't know.

"Q. I mean right when you get to that front door, the main door, you didn't pay any attention to whether there were fresh prints, *what appeared to be fresh prints in the snow there?*

"A. No, I did not." (Emphasis added.)

In response to this cross-examination of Dwyer, the prosecutor stated in closing argument:

"Mr. Meshbesher on cross-examination asked Mr. Dwyer, 'Isn't it true that there was tracks in the snow outside that door?' and Mr. Dwyer said, 'I don't know,' and Mr. Meshbesher said, 'Isn't it true that the snow was not shoveled?' and Mr. Dwyer said, 'I do not know.' Eventually, Ladies and Gentlemen, when the State got around to that portion of the case, we put this photograph in of the exterior of the front door. There is no snow in sight whatsoever.

"I want to talk to you for a minute about tactics. I've tried on behalf of the State to give you the evidence that we have in the most coherent understandable way, but there are things that can be done to make it difficult for a Jury to reach its decision. I have to prove this case to you beyond a reasonable doubt and I must use acceptable and ethical tactics. *I said ethical, not unethical.* An ethical tactic is to try to raise doubt in the minds of Jurors for the Defense, because if you have a doubt, then, the Defendant is acquitted, *but some of the things that have been used to raise doubt in this case exist only in the mind of the Defendant's lawyer.* They are not in evidence. They are not truth. *The snow existed only in Mr. Meshbesher's mind.* It was not on the ground. It was 40 degrees or better, but he wanted you to think that there was snow." (Emphasis added.)

Although from hindsight it might be said that the prosecutor could have used a better choice of words, we do not believe these remarks were improper. The same conclusion can be drawn from the other contentions of the defense concerning uncalled-for personal attacks on defense counsel. When the prosecutor's comments are viewed in their entirety they are within proper bounds.

▪ Defendant also argues that the prosecutor and the trial judge acted improperly during defense counsel's final argument. Defendant's attorney stated in closing argument that defendant's clothing had been tested for gunpowder residue and that none had been found. The prosecutor objected to this statement by saying, "I think, Your Honor, I would object to this, Counsel taking liberties with the record," and argued that defendant's clothes had not been examined for gunpowder residue. The trial court responded, "Well, the Jury is going to have to refer to their own recollection. My recollection is that the Defendant's clothing was never tested for nitrites resulting from gunshot powder." After a ten-minute recess, during which testimony was reviewed by the court and counsel, the court determined that defense counsel's recollection of the evidence was correct and so instructed the jury. The court also gave the jury a cautionary instruction that the court does not favor one side over the other, and that the jury must rely on their own recollection of the evidence over that of the court or counsel. In light of the cautionary instructions given by the court, we do not believe that either the comments of the prosecutor or those of the trial court prejudiced defendant's right to a fair trial.

In summary, we agree with the trial court that the state's closing argument did not exceed the bounds of proper prosecutorial advocacy.[5] It should be pointed out that defense counsel in his final argument,

---

5. It should be noted that, in its brief, the state accuses defense counsel of various improprieties at trial. However, whether these allegations are true is not pertinent because any improper conduct on the part of the prosecutor could not be justified on the ground that it was caused by or a response to defense counsel's indiscretions. See, *State v. White*, 295 Minn. 217, 203 N.W.2d 852 (1973).

very capably and effectively handled the rebuttal of the state's contentions. Accordingly, we are convinced that the jury's verdict was based exclusively on the evidence as presented and was not influenced by improper considerations.

2. Other related accusations made by defendant against the prosecutor are likewise without merit. He claims that the prosecutor improperly elicited testimony regarding defendant's sex life with his girlfriend, Jan Yahnke. On direct examination, the state's attorney only asked Yahnke whether she had engaged in sexual intercourse with the defendant prior to the time she was "tricked" by defendant and his mother into having a pregnancy examination. This question was certainly proper, because it helped explain an incident which demonstrated the relationship between defendant, the alleged assailant, and his mother, the victim. See, *State v. Diamond*, 308 Minn. 444, 241 N.W.2d 95 (1976). This was the only reference that the prosecutor made on direct examination to defendant's sexual activities with Yahnke. It was defense counsel, on cross-examination of Yahnke, who next mentioned the subject:

"Q. Now you respected Gary as a man of high principle, did you not?

"A. Yes.

"Q. Didn't you tell your mother that's one reason you liked Gary, that he respected people and respected women?

"A. He seemed to.

"Q. In fact, he did not have any sex with you because he wanted to wait til the marriage date, did he not?

"A. That is one impression I got from him, yes.

"Q. When you actually lived with him in the same apartment, which was a very small apartment, for two weeks you had no sexual relations with him, isn't that true?

"A. That is correct."

Apparently defense counsel sought to present defendant to the jury as a man of high principle by eliciting the above testimony. Only in response to this evidence did the prosecutor, on re-direct examination, ask Yahnke if defendant had ever attempted to have sex with her. She then responded:

"A. Gary tried to in time bait me into having intercourse with him and I had no desire for it. He started chasing me around the house and he was grabbing at me and he was just very, very insistent on having sex with me and I had no desire for it, but he kept at it and at it and I turned very cold and he tried, * * * ."

In light of the fact that defendant "opened the door" to this subject, the prosecutor's question was proper. Accordingly, defendant's argument that the prosecutor improperly elicited testimony regarding defendant's sexual activities must be rejected.

Defendant next argues that the prosecutor acted improperly by insinuating that "defendant and his mother had an abnormal *sexual* relationship" (emphasis added). He claims that when three particular statements of the prosecutor are "[j]uxtaposed with nonexistent evidence, the relationship *sounded* abnormal" (emphasis added). Those statements are that defendant's relationship with his mother was so close that (1) it "interfered with [Ms. Yahnke's] relationship with [him]," (2) that he "apparently never had any other girlfriends as far as we have been able to get any testimony before you," and (3) that "the defendant at the age of 28 spent more time and did more things with his mother than he did with any female of his own age." These statements, however, find support in the record as they are reasonably inferable from the evidence.[6]

---

**6.** Although Yahnke did expressly state that her relationship with defendant was not affected by defendant's relationship with his mother, she clearly indicated in her testimony that she became very upset at defendant because he and his mother had tricked her into having a pregnancy examination. Moreover, it is reasonable to infer from other evidence that defendant once told Yahnke he was getting pressure from his parents about his relationship with her.

But more important, these statements, as well as other remarks of the prosecutor, did not convey to the jury the impression that defendant had an "abnormal sexual relationship" with his mother. After reviewing the record, we agree with the trial court's assessment of defendant's claim:

> "The question of the impact of statements made by the Prosecutor regarding the 'unusual' relationship between the Defendant and his mother in the opinion of the Court did not have great bearing in this case and, if anything, they mitigated in favor of the Defendant in that it was virtually undisputed in the proof that they had a very close relationship, the Court being of the opinion that the relationship between the parties in a case of this nature is relevant, it is material and it's a proper evidentiary subject."

It should also be noted that defense counsel, at the end of final arguments, requested that the court instruct the jury that there was no evidence of an abnormal relationship between defendant and his mother. Although the court was surprised that defendant would want such an instruction, he agreed to give it.[7]

 Finally, defendant contends that the following prosecutor's comments, relating to a possible "catalyst" for the killings, were improper:

> "The crucial aspect of Janette Yahnke's testimony is Janette Yahnke, that person, that personality. That lady was divorced, had a child in the custody of her ex-husband, who moves into the second floor with the Defendant, who has apparently never had any other girlfriends as far as

we have been able to get any testimony before you and who has such a close relationship with his mother. *I suggest to you that the crucial part of Janette Yahnke's testimony is that she is the catalyst that set this whole thing off.* I don't mean she is to be blamed for it, I just mean that if you take the situation that the Fossens had since at least 1971 and inject Janette Yahnke's personality on it and apply that personality to Gary Fossen, the Defendant, a person who wanted to see Janette all the time and who was very interested in her, and there was testimony that he always wanted to be with her, wanted to see her every night; if you inject her personality and the kind of fire and difficulty that she is able to inject to this already troubled family, I suggest she is the fuse to the powder keg and that the important aspect of what Janette Yahnke has to show you is her own personality, the way she behaves, not so much what she says." (Emphasis added.)

This theory espoused by the prosecutor is reasonably inferable from the evidence. The evidence indicates that the Fossen household was somewhat volatile in that Leroy and Muriel quarreled and Leroy and defendant also had arguments. For two weeks in January, Yahnke moved into the Fossen house and lived with defendant. They quarreled, resulting in Yahnke's eviction from the house. After the fight she returned and found defendant crying and beating his hands on the floor, and complaining that his parents were pressuring him, that he felt emotionally "threatened" by her, and that he couldn't take it any

---

The second statement is supported by the testimony of James Graves, who stated that to the best of his knowledge defendant did not appear to have any other girlfriend besides Yahnke. Yahnke was asked if defendant ever discussed with her any previous relationship he had with other girlfriends, and she responded, "Yes." However, as a result of an objection by defense counsel, Yahnke was not able to testify regarding what defendant had told her. As for the third statement, Keith testified that defendant and his mother had a very close relationship and liked to do things together, such as visiting the library in the evening. He stated that it

was " * * * a very close give and take type of thing. They really cared about each other." Other evidence indicated that defendant "almost worshipped" his mother.

7. The court's instruction reads as follows: "Further, there is no evidence of an abnormal relationship between the Defendant and his mother. There is no evidence that the Defendant suffers from an abnormal sexual orientation and you must disregard any remarks of Counsel which may have suggested or implied that."

more. Later, another fight erupted between defendant and Yahnke because he and his mother had "tricked" her into taking a pregnancy test. These facts provide a reasonable basis for the prosecutor's remarks and, accordingly, we reject defendant's contention.

■ 3. Defendant next argues that the trial court erred by not allowing defense witnesses to testify regarding whether tail lights could be seen between the campers parked outside the Fossen home from the back stairs of the house. Defense counsel, of course, sought to introduce this evidence to corroborate defendant's story and contradict the state's witnesses who testified that tail lights could not be seen between the campers from the stairs. The trial court disallowed this testimony on the ground that a proper foundation had not been established.

In *State v. DeZeler*, 230 Minn. 39, 49, 41 N.W.2d 313, 320 (1950), this court articulated the standard for determining whether such experimental evidence is admissible:

> " * * * The performance of experiments in the presence of the jury, or the admission of evidence of experiments performed out of the presence of the jury, when they are made under conditions and circumstances *substantially similar* to those existing in the case at issue, for the purpose of proving facts in issue, rests in the *sound discretion of the trial court* in both criminal and civil proceedings. The qualifications of the person or persons conducting a particular type of experiment, as well as the extent of permissible dissimilarity in conditions and circumstances, depend on the facts peculiar to each case." (Emphasis added; footnote omitted.)

In this case, defendant sought to introduce the evidence in question through two different witnesses, Keith Fossen and Vince Carraher, a private investigator employed by defense counsel's law firm. Keith testified that he stood on the Fossen back stairs only a few nights before taking the stand, over a year after the murders had taken place. By that time Leonard Lombard had moved his camper business to a different location and a new dealer had moved in with new campers.

Carraher had gone to the Fossen residence about a week to ten days after the shootings. He stated that he made no "direct" inquiries to determine whether the location of the campers had been changed, and assumed that they were the same campers as on the night in question and had not been moved. Carraher testified that he measured the distance between two of the campers and found it to be 33 inches. Lombard had testified that the distance between his campers was "about 20 inches." In finding that a proper foundation had not been laid for Carraher to testify, the trial court stated, "I think by the witness' own testimony he disqualified himself."

The defendant then made an offer of proof that *reflections* could be seen on the night of the shootings, by way of the alleged reflective sides of the campers. The trial court noted that there was no proof of that. Defendant then sought to introduce evidence to show that the reflection of tail lights was visible on a garage window behind the campers. The trial court rejected this contention by reasoning that defendant claimed he saw tail lights between the campers, not that he viewed reflections in the windows of the building. As is apparent from the above, it was reasonable for the trial court to conclude that an adequate foundation had not been established and, accordingly, the court acted properly within its discretion in refusing to allow Keith Fossen and Vince Carraher to testify regarding these matters.

■ 4. Defendant's next assertion is that the trial court erred by not allowing the tape-recorded statement to be taken into the jury room. He argues that the Rules of Criminal Procedure require that all exhibits must be taken to the jury room and that the trial judge has no discretion in the matter. The rule in question, Rule 26.03, subd. 19(1), reads as follows:

> "Materials to Jury Room. The court *shall permit* the jury, upon retiring for

deliberation, to take to the jury room exhibits which have been received in evidence, or copies thereof, except depositions and may permit a copy of the instructions to be taken to the jury room." (Emphasis added.)

This provision "adopts the substance of Minn.St. 631.10." [8] See, Comment to Rule 26. In *State v. Olson*, 95 Minn. 104, 103 N.W. 727 (1905), this court acknowledged that a predecessor statute to § 631.10,[9] which was substantially identical to § 631.-10, allowed a trial court to withhold exhibits from the jury in the exercise of its discretion. Accordingly, consistent with the *Olson* case, we hold that Rule 26.03, subd. 19(1), authorizes the trial court, in the exercise of its discretion, to preclude some exhibits from being taken to the jury room.[10] We also believe that, in this case, the district court acted within its discretion in not allowing the tape recording to be used by the jury during its deliberations. An essential part of the defendant's case was to convince the jury that the statements made on the recording were true. The trial court believed that the jury could make its determination on one hearing of the tape, and that to permit the jury to replay the tape "time and again in the Jury Room" would be improper.[11] The trial judge told the jury, prior to playing the recorded statement, that:

> "I would admonish the Jury that you will hear this tape once as you would testimony by any witness, so you listen carefully. * * * This Exhibit will be received as a Court Exhibit but it will not go into the Jury Room, * * *."

In light of the facts that the jury was advised that it would only hear the recording one time and that the repetitious playing of the tape could, arguably, unfairly impassion the jury, the trial judge did not abuse his discretion.

5. As to the sufficiency of the evidence, in *State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978), this court stated:

> " * * * When reviewing a jury verdict, we must examine the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testimony which conflicts with the result it reached. If on the basis of the evidence in the record the jury could reasonably have found as it did, we may not upset that conclusion. [Citations omitted.]"

Additionally, it must be remembered that "[t]he circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. [Citations omitted.]" *State v. Morgan*, 290 Minn. 558, 561, 188 N.W.2d 917, 919 (1971). Application of the above principles to the instant case shows that the jury verdict was properly supported by the evidence.

The shotgun found lying on Leroy's body was determined to be the murder weapon. No evidence to the contrary was introduced at trial. Although the gun belonged to

---

**8.** Minn.St. 631.10 read, in relevant part, as follows: "CERTAIN PAPERS MAY GO TO JURY ROOM. Upon retiring for deliberation, the jury may take all papers which have been received as evidence in the cause, or copies of such parts of public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. It may also take with it notes of the testimony or other proceedings on the trial taken by one of its number, but none taken by any other person."

**9.** See, Gen.St.1894, § 5375.

**10.** We also note that this conclusion is consistent with ABA Standards, Trial by Jury, 5.1(a),

which is cited approvingly in the Comment to Rule 26.

**11.** The trial court stated in its memorandum: "Regarding the objection to the Court's ruling that the tape-recording made of the Defendant on the night of the occurrence should have gone to the jury, the Court was of the opinion that it would not have been helpful to the jury in that the Defendant, of course, was very emotional and the content of the statement made by him on tape that night was given to the jury and it was very understandable to them in the Courtroom. The Court was of the opinion that repetitious replaying of it in the jury room would have served no useful purpose."

Keith, defendant had used it in the fall while hunting. The testimony shows that the gun had been taken up to defendant's room after the fall hunting trip, and there was no evidence that prior to the shootings it had been removed from his room. Accordingly, it is reasonably inferable from the evidence that defendant was familiar with the operation of the murder weapon and that the gun was easily accessible to defendant.

The buttons found on the floor of the kitchen were ripped from the shirt which defendant wore on the evening of the killings. Leroy's face was bruised and one of his teeth was chipped, indicating that he had struggled with his assailant. It is reasonably inferable from this evidence that defendant struggled with Leroy prior to the murders, causing his shirt to tear.

Defendant told numerous people that Leroy had said someone in a brown car had committed the crime. However, a medical expert testified that it would have been impossible for Leroy to speak. Similarly, it was reasonably inferable from the evidence that defendant lied about seeing tail lights between the campers. Two state witnesses testified that it would have been impossible to see between the campers from the Fossen home's back stairs.

After defendant claims to have discovered the killings, he did not call an ambulance although at the time he apparently did not know that, at least, his sister and mother were dead. Defendant knew his baby nephew was in the basement of the home, but he did not check to see if he was harmed. Later that evening, and the following day, defendant did not talk about the shootings or funeral arrangements; rather he discussed the family business with Yahnke. This apparent indifference to his family's welfare provides support for the jury's decision.

Furthermore, there was overwhelming evidence that, contrary to defense counsel's suggestion, Leroy did not kill Muriel and Linda and then take his own life. Similarly, there is no substantial evidence in the record which indicates that intruders had committed the killings except for defendant's references to the "brown car" and the tail lights. Although papers were scattered about the home's office area, no money or valuables were missing. Only one witness testified that the front door was open immediately after the shootings. All other witnesses stated that it was closed. Additionally, it is unlikely that intruders would have come to the Fossen home and gone up to defendant's bedroom to equip themselves for the murders. Rather, if intruders had committed the killings, they would presumably have brought their own weapons.

It is reasonably inferable from the evidence that the defendant was a very troubled man and that his various relationships with his mother, Yahnke, and his father apparently caused him to lose control. Based on the above evidence, the jury verdict finding defendant guilty of second-degree murder is reasonable and thus will not be disturbed.

■■■■■■ 6. Finally, defendant claims that the trial court erred by giving the following jury instruction:

"You are also instructed that a Defendant's plea of Not Guilty is not evidence of his innocence."

Such an instruction, though an accurate statement of the law, is inadvisable because it may confuse the jury as to the proper presumption of innocence. However, the jury was also instructed that:

"A defendant, having entered a plea of Not Guilty, is presumed by law to be innocent of the charge which has been made against him, and such presumption of innocence continues to surround and protect him until the contrary is proven. It is also the law necessarily incident to this presumption that the burden of proof rests upon the State to prove the Defendant guilty beyond a reasonable doubt."

This correct instruction on the presumption of innocence rectifies any prejudice defendant may have suffered as a result of the instruction in question. Thus, we conclude

that the error is "harmless beyond a reasonable doubt." [12]

The conviction is affirmed.

---

**12.** Where constitutional rights are involved, an error is harmless if the court can "* * * declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967); see, also, *State v. Vance*, 254 N.W.2d 353 (Minn.1977); *State v. Roberts*, 296 Minn. 347, 208 N.W.2d 744 (1973).