## STATE v. MAX GUEVARA.

133 N. W. (2d) 492.

March 5, 1965—No. 39,190.

*Ramon I. Esparolini,* for appellant.

*Robert W. Mattson,* Attorney General, and *William B. Randall,* County Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Defendant appeals from a conviction by a jury of first-degree manslaughter upon a charge of an assault with a knife in the heat of passion resulting in the death of the person assaulted. His appeal assigns as error the court's refusal to grant a new trial upon the claim of prejudicial misconduct of the prosecuting attorney during cross-examination and closing argument. A brief recital of what the evidence tends to establish is necessary to understand defendant's contentions and our decision.

Late one Saturday afternoon in the fall of 1962, defendant, a 62-year-old tannery worker of Mexican birth, entered the Tap-a-Keg Tavern in St. Paul. He and two friends came through the back door of the small establishment and stationed themselves at the bar to have a beer. Soon after their arrival, one of defendant's companions left to make a telephone call, and defendant's attention settled

on a booth where two women were sitting. He approached the booth, engaged the women in conversation, and eventually offered to buy them a beer. Francis Campbell, sitting in a nearby booth with his cousin and friends, stood up and addressed defendant, saying, "Don't monkey with that woman because that is somebody else's woman." As related by one of these women, defendant replied, "Don't monkey with me," and, perhaps, "I will kill you," to which Campbell answered, "I am not scared."

The bartender intervened before more than words had been exchanged. A few moments later, Campbell said goodbye to his cousin and friends and departed by the back door with a farewell and wave observed by the bartender and three patrons. According to those three patrons and another customer, defendant was not near the back door when Campbell left. Approximately 10 minutes afterward, the bartender saw defendant enter the back door, looking pale and agitated. He approached his friend who had remained at the bar and muttered, "Joe, let's go," whereupon they both left by the front door. The bartender, his suspicions aroused by his previous intervention and defendant's appearance, sent two patrons to look out the rear door. There they discovered Francis Campbell, bleeding profusely, lying on the sidewalk of the parking area. The police were summoned and Campbell was taken to Ancker Hospital, where he died 5 days later. The cause of death was complications arising out of stab wounds in the face, neck, shoulder, and lower abdomen.

After defendant left the Tap-a-Keg, he and his companion located their other friend across the street in a telephone booth. The three men went together to their car, which was parked at the rear of the tavern, and proceeded to the house of Carlotta Arellano, a friend of defendant's. He told her that he had done a "marranada," which she interpreted as "something dirty" or a "mess," and she convinced him that he should give himself up to the police. This he did later that night.

What occurred during the 10 minutes or so between Campbell's departure and defendant's departure and reentry was described at trial by only two persons, Marvin McDowell and defendant. Defendant,

who understood English fairly well but had difficulty expressing himself in English, received and answered questions at trial with the aid of an interpreter.[1] He testified that after the verbal exchange with Campbell he had gone to the jukebox near the rear door. As he was bending over to deposit a dime, Campbell suddenly seized him, dragged him out the door, drove him against the bannister of an outside stairway, then dragged him about 20 feet further. Although he cried out for help both inside and outside the bar, he was not heard above the noise. Defendant, who was 5 feet 3 inches tall and weighed 135 pounds, testified that he was unable to break away from Campbell, who was 5 feet 10 inches and weighed 190 pounds. After being struck, defendant, while being dragged by his right arm, pulled a pocketknife out of his pocket and, in some manner not explained, opened it and stabbed Campbell twice. He denied that he had stabbed him in the lower abdomen, suggesting that Campbell must have fallen on the knife when they both fell to the ground. At that point, related defendant, he was able to break away, to pick up his glasses and hat, and to return to the tavern.

On that same Saturday evening, Marvin McDowell opened the side door of his house to let in his dog. As he opened the door, he heard loud, arguing voices at the rear of the Tap-a-Keg, which was located almost directly across the street from his house. Thus attracted, he saw two men begin to fight. One of them repeatedly cried, "I got enough. I got enough." Then they both fell down, and McDowell saw the sleeve of a light-colored jacket move as if the wearer were striking at the other man two or three times. This occurred in a darkened area. McDowell then saw the man in the light jacket get up off the ground and walk through an area lighted by an electric beer sign on the rear outside wall of the tavern. He recognized the man as the defendant and saw him go in the rear door. McDowell testified he also saw defendant go out the front door. Soon two men came out the

---

[1]Commendably, defendant, being indigent, was also accorded the aid of counsel who could converse with him in Spanish. At the state's suggestion, he was appointed by the court as a substitute for the public defender.

rear door and bent over a man on the ground; others followed, and McDowell joined them.

Upon this evidence, the jury found defendant guilty of manslaughter in the first degree.

On appeal, defendant takes the position that resolving the conflict in the evidence depended so directly upon defendant's credibility that certain conduct of the prosecuting attorney deprived him of his right to a fair trial. Two errors claimed concern references by the prosecuting attorney to an occurrence in 1955 when defendant was the victim of a knifing incident. The first allusion came during cross-examination of defendant—

"Q   You did not ask anybody to call the police from the bar?

"A   No. I didn't tell anyone.

"Q   It was Carlotta who spoke to you and told you that you should go to the police?

"A   Yes. I went to her house and I explained to her what had happened.

"Q   When you say you explained what happened, what did you explain?

"A   I explained that something unusual had happened to me, something that has never occurred to me before.

"Q   Something that had never occurred to you before?

"A   No. Never happened to me.

"Q   You have never been involved in any knifing prior to that time?

"A   No.

"Q   Have you ever been involved in any knifing where anyone cut you?

"A   No.

"Q   You have never been involved in any knifing where anyone cut you in the abdomen?

"A   The only time that I was cut was when they robbed me and took my money.

"Q   When was that?

"A   About eight years ago.

"Q   So that you were involved in a knifing once before?

"A   But, I didn't see this happen. I didn't fight."

After the prosecutor questioned defendant concerning a conviction for simple assault in November 1960 and elicited more details of what defendant told his friend, Carlotta Arellano, defendant's counsel became aware that the prosecutor had a police identification photograph, showing the front and profile view of defendant, lying face up on the counsel table. Counsel promptly moved for a mistrial, which the court refused, and the photo was removed from view forthwith by the court's order.

Finally, defendant alleges that prejudicial error occurred when the prosecutor in final argument stated that defendant was involved in a knifing incident in 1955 as reflected by a defense exhibit of Ancker Hospital records covering four different periods of hospital care given defendant beginning in 1955. Defendant introduced the exhibit as part of the testimony of a doctor he called to describe the bruises he sustained, as he claimed, from the assault upon him by Campbell.

Before discussing the errors assigned, it may be noted that the evidence was sufficient to support the conviction. The testimony, although contradictory, was sufficient to permit the jury to accept the state's version and find that defendant left the tavern after having words with Campbell, waited for him outside, and in the heat of passion and without justification assaulted him with a knife, causing his death.

Whether a new trial should be granted because of misconduct of the prosecuting attorney is discretionary with the trial judge.[2] Since the conduct complained of occurred in his presence, he is obviously in the best position to appraise its effect. His determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and of such serious and prejudicial consequence that our responsibility requires us to conclude that defendant's constitutional right to a fair trial was impaired.[3]

---

[2] 14 Dunnell, Dig. (3 ed.) § 7099b.

[3] State v. Heffelfinger, 200 Minn. 268, 274 N. W. 234; State v. Miller,

We are not persuaded to that conclusion here. Manifestly, displaying the police photograph and emphasizing a knifing incident in which defendant was involved 8 years previously (while neglecting to mention that defendant was the victim, not the assailant) is misconduct. Neither the photo nor the knifing had any reasonable relevance to the charge being tried, and the risk of misleading the jury to defendant's prejudice is obvious. However, the offending photograph apparently was among the papers in the prosecuting attorney's file and was not deliberately placed on the counsel table. Nothing was done to call the jury's attention to it.[4] The record does not reveal how long it remained on the counsel table or suggest that any juror even noticed it. When discovered, it was promptly removed from view. Under the circumstances, we would not be justified in believing that it had any harmful effect upon the trial.

Evidence of the previous knifing incident came into the trial when defendant introduced the Ancker Hospital records. The jury first learned of the incident when the prosecuting attorney, seizing on defendant's statement that he had never been involved in a previous knifing, brought out the facts during cross-examination. Regrettably, the hospital records also contained several pages stamped, "HOLD FOR POLICE." We suspect that when cross-examination began neither counsel was aware of this fact or that defendant was the victim, not the assailant, in the incident described; at least no objections to the questions were made. The matter was not pursued after defendant made clear that he was the victim. The records themselves may well have had more effect on defendant's reputation as a law-abiding citizen than the questions asked. If requested, the exhibit could have been withdrawn after its use by the doctor as a refreshing memorandum. Defendant's explanation of the incident, however, certainly did not

---

151 Minn. 91, 186 N. W. 142; State v. Hass, 147 Minn. 269, 180 N. W. 94.

[4]Cf. Maher v. Roisner, 239 Minn. 115, 57 N. W. (2d) 810, 37 A. L. R. (2d) 658, where one of the attorneys caused inadmissible newspaper clippings to be scattered at his adversary's feet while his adversary was making final argument.

justify reference to it in final argument. Although counsel may comment on evidence admitted during the trial,[5] he ought not to do so when the risk of prejudice exists by an improper interpretation of a collateral matter. Since the prosecuting attorney was properly prevented from stating more than what the exhibit itself revealed, we cannot believe that this indiscretion had any appreciable effect on the good judgment which a jury customarily exercises in not being swayed by every careless remark made in final argument.

We therefore hold that the misconduct which occurred, whether the incidents discussed are viewed independently or cumulatively, was not of such prejudicial character as to require a new trial under the circumstances of the case.

Affirmed.

---

[5]State v. Sucik, 217 Minn. 556, 14 N. W. (2d) 857.