**STATE of Minnesota, Respondent,**

v.

**Dameion ROBINSON, Appellant.**

No. C6–98–1849.

Supreme Court of Minnesota.

Jan. 13, 2000.

John M. Stewart, Minnesota State Public Defender, Michael F. Cromett, Assistant Public Defender, Roseville, for appellant.

Dameion Robinson, pro se

Michael A. Hatch, Minnesota Attorney General, St. Paul, Amy Klobuchar, Hennepin County Attorney, Michael J. Richardson, Assistant County Attorney, Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

On August 24, 1997, Derangle Riley was shot to death by a single .25 caliber gunshot wound to the head from close range. Following a jury trial in Hennepin County District Court Dameion Robinson (appellant) was convicted of first-degree murder of Riley in violation of Minn.Stat. § 609.185(3) (intentional during aggravated robbery) and murder in the second degree in violation of Minn.Stat. § 609.19(1) (intentional). The trial court sentenced appellant to life imprisonment. On review he argues that prosecutorial misconduct deprived him of his constitutional right to a fair trial, the court erred in admitting *Spreigl* evidence, the court erred in denying appellant's motion to dismiss the indictment and the circumstantial evidence was insufficient, as a matter of law, to sustain the first-degree murder conviction. We affirm.

Derangle Riley's body was found in the driver's seat of his car in the St. Thomas Episcopal Church parking lot at 4400 Fourth Avenue South, Minneapolis around 7:30 a.m. on August 24. Riley was last seen at approximately 12:30 a.m. that day and an autopsy determined that the shooting occurred before 3:30 a.m. Gunshot wounds indicated that the gun was fired at close range from the passenger side of the front seat of his car and blood splatter was found on the inside of the car windshield. Riley's front pants pocket was pulled out and turned inside out and although he had no drugs or money when his body was found, he was wearing a gold ring with diamonds and had a crack pipe in his possession.

Riley's friend Saint Slaughter found Riley's body as Slaughter returned home after spending the night with his girlfriend Letrice Stanley. Upon finding the body Slaughter went to his house at 4440 Clinton Avenue South, Minneapolis ("Slaughter house"), where he lived with Alayna Hanson, another girlfriend, and called 911 to report the death. Because Slaughter did not want Hanson to know he had been with Stanley, he told the 911 dispatch that he had gotten off a bus shortly before finding Riley's body.

Derangle Riley was a Minneapolis drug dealer. When last seen at Slaughter's house with appellant and many others in the evening of August 23, several witnesses testified that appellant had a pistol that later turned out to be the murder weapon. Alayna Hanson saw appellant with a pink pearl-handled .25 caliber pistol that either he or Slaughter put in appellant's jacket pocket and Slaughter also saw appellant with a pink pearl-handled .25 caliber pistol. Traviore Gaston, also at the Slaughter house that evening, saw appellant with a pistol appellant later described to Gaston as a "deuce 5" and witnessed appellant shooting off the pistol that evening in front of the house.

Several witnesses testified that they saw appellant attempt to buy drugs from Riley. Alayna Hanson heard appellant and Riley having a conversation where appellant offered to buy crack but Riley refused to sell at the price offered. Gaston also saw drug negotiations between appellant and Riley and after negotiations failed, Gaston's wife Melissa saw appellant attempt to open Riley's car door.

Several witnesses observed appellant with Riley when he was last seen alive. Around midnight Riley went outside the Slaughter house to meet Jeffrey Carberry to sell him drugs. Carberry, who came in another car with his friend Jody Gronlund, got into the passenger front seat of Riley's car and caught a glimpse of another individual who got into the back seat. Carberry did not know who this was at the time but later identified two people from a photographic lineup as resembling the man in the backseat. One was appellant. Traviore Gaston also saw appellant get into the back seat of Riley's car. Carberry purchased twenty dollars worth of cocaine from Riley for Gronlund while she waited in her car parked right behind Riley's car.

When he left Riley's car, Carberry noticed the person in the backseat get out, walk around and get into the passenger side front seat. Jody Gronlund went over to Riley's car to speak with him and while there saw a person with braided hair, whom she described as looking like Snoop Doggy Dog, get out of the backseat and into the passenger side front seat. Gronlund noticed that Riley had drugs, in the form of rocks, packaged in a torn sandwich bag. After their exchange both cars drove away. Letrice Stanley testified that the previous afternoon she braided appellant's hair and while there, he showed her a small caliber pink pearl-handled pistol.

Approximately fifteen to twenty minutes after Riley drove off with appellant, Hanson saw appellant return to the Slaughter house and then leave with appellant's brother Danny. Around 1:30 a.m. appellant and his brother went next door to 4444 Clinton Avenue South and then to Jody Gronlund's house where appellant provided crack for Jody, Jill and Danny. Jody noticed that appellant, the person she previously described as "Snoop Doggy Dog," had what appeared to be the same crack in quantity and packaging as Riley had when she saw him in his car earlier in the evening. She later identified two men out of a photographic lineup as resembling the appellant, expressing a preference for number six, the appellant.

Appellant returned to the Slaughter house later in the morning of August 24 and when Hanson told him about Riley's death, he showed no reaction. Hanson also mistakenly pointed in the wrong direction to indicate where Riley's body was found but when appellant later referred to Riley's body he pointed in the correct direction.

Appellant's theory at trial was that Slaughter committed the murder. Slaughter originally told the police that he was with Letrice Stanley from 5:30 p.m. on August 23 to 6:00 a.m. on August 24. At trial however, Slaughter said he did not go to Stanley's house until between 10:15 and 10:45 p.m. Stanley confirms he was with her estimating his arrival at about 10:30 p.m., and testified that he then spent the night with her and left around 7:00 a.m. Slaughter also told police that appellant fired the .25 caliber handgun in his front yard on August 23. On August 27, the police searched the yard and found no .25 caliber shell casings, but when the police returned the next day a shell casing was found in a bare spot in the yard. The state conceded during its closing argument that the casing was obviously planted. Appellant claims the planted casing was further evidence of Slaughter's effort to frame appellant for the Riley murder.

Appellant admitted to police that he asked Riley for a ride that evening but claims he never got into Riley's car and that he had gone to another friend's house to buy crack when the shooting occurred. Appellant denied killing Riley.

The *Spreigl* evidence concerned another robbery shooting in the evening of August 24, 1997. At around 9:00 p.m. Johnny Edwards, accompanied by appellant, went to Evelyn Dawson's residence at 23rd Avenue and 4th Street in North Minneapolis to sell two guns to Dawson's boyfriend Devin Mosley, who then would sell them to Jeffrey Morris and Troy Jackson. Mosley and Jackson testified that shortly after Edwards and appellant entered the apartment appellant flashed a .25 caliber gun with a pinkish pearl-handle and ordered Mosley and Jackson to go into the bathroom. Jackson testified that when he headed for a bedroom appellant shot him in the leg. Morris testified that he was shot in the chest by appellant. Ballistic analysis indicated that the bullet from the Jackson shooting was fired from the same gun that killed Riley. In a lineup Dawson, Jackson and Morris each identified appellant as Edward's companion in the robbery shooting incident.

Appellant was indicted on September 30 for two counts of first-degree murder (premeditation and intentional while commit-

ting aggravated robbery) in connection with Riley's death. The indictment was dismissed on the basis of prosecutorial misconduct at the grand jury proceeding,[1] but appellant was re-indicted on the same two counts on April 21, 1998. He again moved to dismiss the indictment, this time claiming that the grand jury inappropriately heard a summary of the police investigation. On the basis of the trial court's review of the testimony of various grand jury witnesses, it determined there was sufficient evidence to support the indictment and appellant's dismissal motion was denied. The court also rejected appellant's claim that the state had an obligation to call additional exculpatory witnesses.

At trial the court admitted as *Spreigl* evidence the August 24, 1997 robbery and shooting of Mosley and Jackson. The court found the witnesses credible and noted the similarity of the crimes in time and location, that appellant was identified as Edward's accomplice and that the same gun was used in both crimes. The court concluded there was clear and convincing evidence of appellant's involvement in the Mosley and Jackson robbery shooting.

After a day of deliberation the jury returned a verdict of guilty of murder in the first-degree in violation of Minn.Stat. § 609.185(3) (intentional during aggravated robbery) and murder in the second degree in violation of Minn.Stat. § 609.19(1) (intentional). Appellant challenges his conviction on four grounds: prosecutorial misconduct deprived him of a fair trial, the trial court improperly admitted *Spreigl* evidence, the trial court erred in upholding the second indictment and there was insufficient evidence to sustain the conviction.

### 1. Prosecutorial Misconduct

■ Appellant alleges many instances of prosecutorial misconduct during closing argument. We have held that the determi-

nation of whether a prosecutor engaged in prejudicial misconduct is largely within the discretion of the trial court and we will reverse only where the misconduct, viewed in light of the entire record, is of such serious and prejudicial nature that appellant's constitutional right to a fair trial was impaired. *See State v. Johnson,* 277 Minn. 230, 235–36, 152 N.W.2d 768, 772 (1967); *State v. Guevara,* 270 Minn. 356, 360, 133 N.W.2d 492, 495 (1965). Cautionary instructions given by the trial court relating to allegations of misconduct are a "significant factor favoring denial of a motion for a mistrial," *State v. Caldwell,* 322 N.W.2d 574, 590 (Minn.1982), and if a defendant fails to object or request cautionary instructions to the prosecutor's comments during closing argument generally the issue cannot be raised on appeal. *See State v. Whittaker,* 568 N.W.2d 440, 450 (Minn. 1997).

■ We first address appellant's claim that during the state's closing argument the prosecutor on several occasions commented to the jury that appellant had the burden of proof to call witnesses in his defense. Appellant claims that the prosecutor's statement, "but really the proof is in the pudding and they will cite to three things to demonstrate that Saint John Slaughter is, in fact, the murderer here" suggested to the jury that the defendant had the burden of proof of his innocence. When appellant objected to this statement the court gave a corrective instruction, but appellant asserts that the prosecutor again improperly made the suggestion by stating that the appellant would "point to three facts – three factors to establish or suggest or allege that Saint John Slaughter was the murderer." Appellant argues that the prosecutor continued the improper argument when he stated, "If that's true [appellant's statement to police that after talking with Riley he left to go buy drugs],

---

1. The basis of the prosecutorial misconduct determination is unclear. Appellant claims that the first indictment was dismissed because the "prosecutor overcame the indepen-

dence of the jury by suggesting he and the jury were on the same side," an assertion undenied by the prosecutor.

why is it nobody else sees this? Why isn't there one witness, one of his friends, that can confirm that point?," [2] and then: "[b]ut not one witness that we presented ever said that they saw this man on the telephone or paging someone for crack/cocaine. Nobody said that. And why is that?" Appellant also claims that the prosecutor continued his suggestion that appellant had the burden to prove his involvement when he stated, "I mean, common sense tells you that if another witness sees it, they could corroborate it * * * if you have people at a party, you have some corroboration but you don't," and later, as to where appellant went after the shooting, "someplace we'll never know, some place that he knows." [3]

The constitutional presumption of innocence and burden on the state to prove the accused's guilt beyond a reasonable doubt are bedrock to our criminal justice system, *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn.1995), and we have noted that although a prosecutor's comment on the failure of the defense to call witnesses to support the defendant's alibi may not necessarily warrant a new trial, it "does not meet with the approval of this court." *State v. Bell*, 294 Minn. 189, 192, 199 N.W.2d 769, 771 (1972) ("we do note with disapproval counsel's comment upon the failure of the defense to call witnesses to support defendant's alibi"). In *Caldwell* the prosecutor suggested that evidence had been falsified and that the jury should take into account the appellant's failure to explain his absence, a comment we held

was "absolutely inappropriate." *See Caldwell*, 322 N.W.2d at 590.

Appellant here argues that the cumulative effect of the prosecutor's statements regarding witnesses and burden of proof could not be cured by the trial court's corrective instruction and that, as in *Caldwell*, the statements justify a new trial. The prosecutor's comments in *Caldwell* differ significantly from the comments here however, as here they clearly went only to the adequacy of the evidence and the credibility of the witnesses in support of appellant's alibi, an argument we approved in *State v. Salitros*, 499 N.W.2d 815, 818 (Minn.1993) ("prosecutor is free to argue that there is no merit to a particular defense in view of the evidence"). We acknowledge that there may be a fine line between fair comment on the absence of evidence and a prosecutor inappropriately arguing that the accused failed to prove his innocence—but it is a line that was carefully protected by the trial court here in response to defense counsel's numerous objections. The court's repeated instruction on the state's burden to prove the defendant's guilt leaves no doubt that the jury could not have been misled that it was the burden of the state to prove each element of the charged crime beyond a reasonable doubt. We further note that while in no sense is this court critical of the defense counsel's numerous objections during the prosecutor's argument, many on review here, it has not gone without notice that the argument of appellant's attorney was itself of questionable tone and professionalism.[4] While certainly one

---

2. Appellant's objection was sustained and the prosecutor acknowledged that the appellant does not have the burden of proof.

3. Appellant also asserts that the prosecutor inappropriately commented on the failure of Danny Robinson, appellant's brother, to testify. We disagree. The trial court had previously ruled that the prosecutor could comment, a ruling that was within the court's discretion.

4. In closing arguments the defense attorney remarked, "And I ask you, can each of you

give Dameion Robinson justice in this case? Or does justice only apply to people who look like this prosecutor, people who act like him * * * It's only people that live in this world [that lie] (indicating defendant), some alien world, not [the prosecutor's] world." She also asked, "Do you think that if a police officer had been killed and found in that car that you would have heard a little more effort here to try to gather some physical evidence? Was it just because a black dope dealer was killed?"

counsel's improper argument does not justify that of another, it is equally clear that we do not review a trial record in isolation in our search to determine if an accused received a fair trial.

 We next address appellant's claims that the prosecutor's comments during opening and closing arguments that the appellant was not of the same world as the jurors and clearly was distinguishable from a businessman from Edina, Pope John Paul and Mother Teresa impermissibly appealed to the prejudice and passion of the jury. We disagree. In the context of the circumstances surrounding the crime, it seems clear that these comments did little more than prepare the jury for evidence of an unfamiliar world involving drugs.

Other objections relating to arguing facts not in evidence and appeals to the passion and prejudice of the jury require no further review here as they were either without objection or, where ruled objectionable, the court made an appropriately corrective instruction.

 Last, we address appellant's contention that the prosecutor engaged in misconduct relating to an encounter between counsel outside of the courtroom. The trial court declined appellant's request that it reprimand the prosecutor for improper behavior, stating it "expect[ed] certain decorum and certain behavior from the attorneys in this case. It has been, I will note for the record, beyond, in my viewpoint, a hard-fought case. It's been acrimonious and I want people to be civil to each other." The court was exemplary in conducting what was indeed a very "acrimonious" trial and we strongly endorse its admonition to counsel to conduct themselves with civility. As the conduct occurred outside the purview of the jury, and indeed outside of the courtroom, there can be no claim that it was prejudicial to appellant's right to a fair trial.

## II. *Spreigl* Evidence

 Evidence of the commission of other crimes (*Spreigl* evidence) may be admitted "to establish motive, intent, absence of mistake or accident, identity or common scheme or plan" *State v. Slowinski*, 450 N.W.2d 107, 113 (Minn.1990), but is inadmissible under Minn. R. Evid. 404(b) to prove that the accused acted in conformity with his character. *See State v. DeWald*, 464 N.W.2d 500, 502 (Minn. 1991). Admissibility is within the sound discretion of the trial court and the court's ruling will be upheld absent a clear abuse of discretion. *See DeWald*, 464 N.W.2d at 503. Where admissibility is in doubt, the *Spreigl* evidence should be rejected because of the risk of undue prejudice to the defendant. *See id.*

 In determining the admissibility of *Spreigl* evidence, the trial court must determine that: (1) there is clear and convincing evidence that defendant participated in the *Spreigl* offense; (2) the evidence is relevant and material to the state's case, and (3) the probative value of the evidence is not outweighed by its potential for unfair prejudice. *See id.* In weighing the probative value of the evidence against its prejudicial effect, the court must consider how crucial the *Spreigl* evidence is to the state's case and admit the evidence "*only if the trial court finds the direct or circumstantial evidence of defendant's identity is otherwise weak or inadequate, and that it is necessary to support the state's burden of proof.*" *Id.* at 504 (quoting *State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284 (1967) ("where the sole issue in a case is the identity of defendant * * * the rigid rules of evidence will be relaxed")). Procedural safeguards govern the admissibility of *Spreigl* evidence requiring the prosecutor to give defense counsel written notice of the intention to introduce evidence of other crimes. *See State v. Bolte*, 530 N.W.2d 191, 196 (Minn. 1995). Moreover, before the *Spreigl* evidence is received and in the final jury instructions the trial court should give the

jury a cautionary instruction.[5] *See Bolte*, 530 N.W.2d at 197; *Billstrom*, 276 Minn. at 179, 149 N.W.2d at 285.

Appellant raises several issues regarding the trial court's ruling that the *Spreigl* evidence was admissible. First, appellant claims that the court erred in relying on *Spreigl* evidence as a basis for denying appellant's motion to dismiss. Specifically, he argues that *Spreigl* evidence is particularly prejudicial where the other evidence of the charged crime is weak and that as a matter of law *Spreigl* evidence should not be admitted in such circumstances. We have observed however, that the risk in admitting prejudicial evidence is not "the damage to opponent's case that results from the legitimate probative force of the evidence; rather it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Cermak*, 365 N.W.2d 243, 247, n. 2 (Minn. 1985) (quoting 22 C. Wright & K. Graham, *Federal Practice and Procedure—Evidence* § 5215 at 274–75 (1978)). Thus, the risk of prejudice lies not in the power of the evidence in and of itself to persuade the jury that the defendant is guilty of the crime charged based on the evidence, but in its potential to influence the jury that if the defendant committed the *Spreigl* offense he must be guilty of the charged offense. It is this concern for prejudice that underlies our reasoning that the use of *Spreigl* evidence should be limited to cases where the evidence of defendant's identity is otherwise weak or inadequate and the *Spreigl* evidence is necessary to meet the state's burden of proof. *See Billstrom*, 276 Minn. at 178–79, 149 N.W.2d at 284; *DeWald*, 464 N.W.2d at 504 (courts must "pay particular heed" to

establish the necessity of *Spreigl* evidence before admitting the evidence). We therefore decline appellant's invitation to take the opposite approach as it is based on a misperception of our concern for the prejudice potential of *Spreigl* evidence. Since neither side disputed that the state's evidence was otherwise weak we conclude that the trial court properly admitted the *Spreigl* evidence.

Next, appellant contends that the trial court should have held a hearing regarding the *Spreigl* evidence, as in *DeWald*. In *DeWald* we affirmed the trial court ruling to admit *Spreigl* evidence following a pretrial hearing and an offer of proof. *See DeWald*, 464 N.W.2d at 504–5. We cautioned that where there is a high risk of prejudice to the defendant "the trial court should postpone the final decision on admissibility of the evidence until the state has presented all non-*Spreigl* evidence and the strength of the prosecution's case can be determined." *Id.* at 504. We also noted that "the trial court should consider, in a close case, requiring an evidentiary hearing to determine the admissibility of *Spreigl* evidence rather than relying on the offer of proof procedure * * * the trial court has broad discretion in determining whether or not to require a hearing." *Id.* at 505. Here the trial court denied defendant's request for a hearing but, unlike *DeWald*, the motion to admit the *Spreigl* evidence was heard after the close of the state's evidence. The trial court concluded that a hearing was not necessary based on its evidentiary review, including statements made by Jeffrey Morris and Troy Jackson, the victims of the *Spreigl* crime, pretrial testimony of police and witness

5. The jury instructions on receipt of *Spreigl* testimony instruct: "[*Spreigl*] evidence is being offered for the limited purpose of assisting you in determining whether defendant committed those acts with which defendant is charged * * * * Defendant is not being tried for and may not be convicted of any offense other than the offense charged in the complaint. You are instructed specifically that you are not to convict defendant on the basis of [the *Spreigl* crime] * * * To do so might result in unjust, double punishment." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice – Jury Instruction Guides, Criminal,* CRIMJIG 2.01 (3d ed.1990). The final jury instructions on *Spreigl* evidence are essentially identical to those in CRIMJIG 2.01. *See id.* at CRIMJIG 3.16.

identifications placing appellant at the scene of the *Spreigl* robbery and shooting.

The trial court did not abuse its discretion in ruling that a hearing was not necessary. The evidence was clear and convincing that appellant participated in the *Spreigl* robbery. Troy Jackson described his assailant as carrying a .25 caliber automatic with a pinkish pearl-handle closely similar to the description of the weapon in appellant's possession shortly before the shooting, and the bullet that struck him was determined by ballistic testing to have been shot from the same gun as the bullet that killed Riley. Jackson also identified his assailant as appellant in a photo lineup, as did Devon Mosley, who also testified that the assailant carried a .25 caliber gun with a pink handle. The inconsistencies in Johnson's and Mosley's testimony cited by appellant were of a minor nature and in no way undermine the quality of the *Spreigl* evidence. The *Spreigl* evidence was also relevant and material to the state's case as both events occurred within close proximity of time and location, both events involved a pink pearl-handled .25 caliber automatic handgun and both involved a robbery. The *Spreigl* evidence was properly admitted.

■ Appellant last contends that an interview with Adairan Davis should have been admitted in evidence in the *Spreigl* proceeding because Davis was unavailable. In his statement Davis stated that Slaughter had a pink-handled gun, that Slaughter and Edwards were going to buy drugs and that they wound up robbing someone. The trial court applied the trustworthiness test required by Rule 804(b)(5) Minn. R. Evid. and did not abuse its discretion in excluding Davis's statements because they were not under oath, they were made five months after the murder and they were not subject to cross-examination.

### III. The Second Indictment

■ Our guiding principal in a challenge to an indictment is "an indictment returned by a legally constituted and unbiased grand jury, * * * if valid on its face, is enough to call for a trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). A "presumption of regularity attaches to a grand jury indictment, and it is a rare case where an indictment will be invalidated." *Marhoun v. State,* 451 N.W.2d 323, 327 (Minn.1990). We have held that while not conclusive, it is proper to factor the jury's guilty verdict into the analysis because of the higher burden of proof required for a conviction, especially where the defendant has a full opportunity to impeach witnesses and discredit the state's case using evidence that may not have been presented. *See State v. Lynch,* 590 N.W.2d 75, 79–80 (Minn.1999).

■ Appellant claims that the grand jury should have heard the testimony of exculpatory witnesses, but as the trial court noted, Cil Boswell was an exculpatory witness who testified that appellant was not at the *Spreigl* crime scene. The trial court properly ruled that the state is not obligated to put on every witness who would similarly testify.

■ Appellant also claims that the grand jury received inadmissible evidence when a police detective testified about the events and witnesses surrounding Riley's murder. The trial court acknowledged that the detective's summary of the investigation included inadmissible hearsay but ruled that there was enough admissible testimony to sustain the indictment. Minnesota Rules of Criminal Procedure require that an indictment be based on evidence that would be admissible at trial. *See* Minn. R.Crim. P. 18.06 subd. 1 & 2. Alayna Hanson, Jeff Carberry and Saint Slaughter testified in the grand jury proceedings and the trial court did not err in concluding that based on their testimony there was sufficient admissible evidence to sustain the indictment.

### IV. Sufficiency of Evidence

■ In a challenge to the sufficiency of evidence our role is limited to "ascer-

taining whether a jury could reasonably find the defendant guilty, given the facts in evidence and the legitimate inferences which could be drawn from those facts." *State v. Miles,* 585 N.W.2d 368, 372 (Minn. 1998). We carefully review the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jury to reach its verdict. *See State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). In our review, circumstantial evidence is weighed the same as other evidence and a conviction based on circumstantial evidence will be upheld if "the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *Webb,* 440 N.W.2d at 430. Inconsistencies in the state's case are not grounds for reversing the jury verdict. *See State v. Pieschke,* 295 N.W.2d 580, 584 (Minn.1980).

▮ Ample evidence supports appellant's conviction. Traviore Gaston and Alayna Hanson testified that appellant had a .25 caliber pearl-handled gun in the evening of August 23 and that appellant and Riley were talking about a drug deal. Hanson testified that either appellant or Slaughter put the gun in appellant's pocket and Gaston testified that appellant shot the gun off in front of Slaughter's house. Gaston, Jeffrey Carberry and Jody Gronlund saw appellant get into Riley's car with Riley shortly before he was shot. Jody Gronlund testified that she later saw appellant with cocaine packaged the same way Riley's was packaged earlier that night. Evidence of appellant's reaction after the crime, the *Spreigl* evidence and the ballistic report indicating that both crimes were committed with the pearl-handled .25

caliber handgun also support the jury's verdict.

Appellant contends that evidence of Slaughter's alibi and the planting of the shell casing in Slaughter's front yard were not properly investigated by the police or taken into account at trial. We disagree. Slaughter was cross examined by defense counsel about his alibi and the state acknowledged that the shell casing had been planted. Regardless of the strength of Slaughter's alibi or the planted shell casing however, there was sufficient evidence adduced at trial for the jury to conclude that beyond a reasonable doubt appellant was guilty of the charged crimes.

▮ Finally, in appellant's pro se brief he challenges the credibility of the state's witnesses and the trial court's ruling prohibiting him from inquiring into the background of Johnny Edwards, his accomplice in the *Spreigl* crime, to show that Edwards and Slaughter were in the same gang. Edwards had only limited involvement in the events surrounding the murder and the court did not abuse its discretion in ruling that his background was irrelevant.

We conclude there is sufficient evidence to sustain the jury's verdict of guilt.

Affirmed.[6]

LANCASTER, J., took no part in the consideration or decision of this case.

---

**6.** The conduct of counsel deserves further comment. We recently observed that where legal advocacy "has the potential for distracting the jury from its proper role, undermining the integrity of the legal profession, and offending the dignity of the court" it should be referred to the state board of professional responsibility for investigation. *See State v. Buggs,* 581 N.W.2d 329, 343 (Minn.1998).

While the conduct here does not appear to rise to that level it does not fall far short of it. The incivility and disrespect counsel exhibited toward each other reflects poorly on counsel and clearly offends the dignity of the courts. No trial judge need tolerate it and should impose sanctions where necessary to bring it to an end.