**STATE of Minnesota, Respondent,**

v.

**James John JORGENSEN, Appellant.**

No. C8–02–322.

Supreme Court of Minnesota.

May 1, 2003.

John M. Stuart, State Public Defender, Jodie L. Carlson, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

PAGE, Justice.

Appellant James John Jorgensen was found guilty of one count of first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2002), after a jury trial in Hennepin County District Court, for the death of his fiancée, Shelby Davis. He was found not guilty of one count of second-degree intentional murder. Jorgensen was sentenced to life imprisonment and ordered to pay restitution. In this direct appeal, Jorgensen challenges the legality of the search that resulted in the discovery of Davis's body. He also claims that he was denied effective assistance of trial counsel when his counsel, without his consent, repeatedly told the jury during his trial that, while he intended to kill Davis, the killing was not premeditated. He further claims that the trial court abused its discretion in refusing to grant a mistrial after the state examined a police investigator regarding whether Jorgensen had a history of violence. Finally, Jorgensen raises a number of pro se issues. We affirm.

Jorgensen and Davis met in 1991, began dating, and started living together shortly thereafter. Jorgensen was in the trucking business and Davis was a graphic design artist. In 1996, they built a home together in Minnetrista, Minnesota. Evidently, before they met, Jorgensen was a cocaine user. At some point after meeting Davis, he stopped using cocaine, but then started again in 1997. At the time of Davis's murder, Jorgensen was smoking crack cocaine daily. His addiction caused him to lose his business and steal money from

Davis, as well as sell their personal property in order to support his cocaine habit.

On Thursday, March 22, 2001, after Davis left for work, Jorgensen went to a pawn shop and pawned a computer and stereo speakers from their home. He bought crack cocaine with the proceeds. Jorgensen smoked the crack as he drove home and, once at home, continued smoking it for the remainder of the afternoon. Expecting Davis to be upset with him for selling their possessions to buy drugs, Jorgensen hid in the basement behind the stairs before Davis arrived home. When Davis arrived home at approximately 7:30 p.m., Jorgensen could hear her walking around the house calling his name. By the tone of her voice, he knew she was angry with him, and he continued to hide. According to Jorgensen, he grabbed an antique sewing bobbin made of wood with brass ends when he "heard her coming down the stairs and hollering my name and sounding upset." He struck her once on the head with the bobbin and she fell to the ground. Jorgensen then straddled her with his knees and, as she apparently tried to defend herself, he hit her two more times with the bobbin, knocking her unconscious. Finally, Jorgensen placed his hand over Davis's mouth and nose for approximately two minutes until she stopped breathing. After she stopped breathing, Jorgensen laid on Davis's body for half an hour, cleaned himself up, then wrapped her body in blankets and carried it into the garage. He also took the diamond engagement ring that he had given her off of her finger. He spent the next several days using cocaine that he purchased with proceeds from pawning the engagement ring for $400, forging Davis's checks for approximately $1,000, and selling his car for $200. He was arrested during a drug raid in Minneapolis on March 31.

## A. Discovery of Davis's Body

On Monday, March 26, Jorgensen called Davis's employer and indicated that Davis would not be coming to work that day because she had gone to North Dakota to take care of a sick aunt. When Davis did not show up for work on Tuesday, March 27, her supervisor contacted Davis's mother to find out why Davis had not reported to work. Upon learning that Jorgensen had said that Davis was in North Dakota caring for a sick aunt, Davis's family became concerned for Davis's welfare because she did not have an aunt in North Dakota. As a result of that concern, Davis's family contacted the Minnetrista Police Department and reported her missing. That same day, the police began conducting welfare checks at the home shared by Davis and Jorgensen in an attempt to establish contact with someone knowing of Davis's welfare, but never found anyone home.

On the evening of March 28, at approximately 7:00 p.m., Sharon Strickland, Davis's sister, went to the house in search of Davis. According to Strickland's testimony, she went to the house to obtain information about Davis's disappearance. Before going to the house, Strickland talked with her mother, her son, her attorney, and one of her friends about breaking into the house. Her son, who had earlier replaced the lock on the house's garage door, told her that door would be the easiest to use for the break-in. When she arrived at the house, Strickland waited to see if anyone would come home and did not break into the house immediately.

At approximately 9:30 p.m., two Minnetrista police officers arrived at the house to check on Davis's welfare and found Strickland sitting in her car. When asked who she was and why she was at the house, Strickland explained that she was Davis's sister, that she was concerned about Davis,

and that she intended to go into the house because she thought something was wrong. The officers conducted the welfare check, found no one home, and told Strickland there was little more they could do. Strickland told the officers that she was going into the house anyway. In response, the officers informed Strickland that they could not be a part of any search, but that they would continue to investigate. Strickland told the police that she was going to break into the house at the risk of being arrested and charged with the break-in. Because Strickland indicated that she was concerned for her safety, the officers stood by as she forced open the garage service door.

Strickland was only able to get the door partially open because it was blocked by something under a blanket. Strickland asked the officers to remove the blanket, but they told her they could not help. They did agree to look under the blanket if Strickland lifted it. Looking under the blanket, the officers discovered Davis's body.

### B. Confession

Jorgensen was arrested on March 31 and gave a statement to the police detailing his involvement in Davis's death. That statement was extremely incriminating and included the following discussion about his thoughts as he suffocated Davis.

Q: And was your intention as you described before to keep her from suffering in that you had already ah hurt her head pretty severely in your estimation?

A: Yes, I just wanted her to be peaceful and didn't want her to have to suffer with any kind of brain damage that it might have caused her.

Q: Did you also fear that if you did not kill her, that she would contact the police about your assault on her?

A: Ah, yes, I did fear that.

At trial, Jorgensen testified in some detail about how he killed Davis. He also testified that the statement he gave to the police was truthful.

### C. Counsel's Concession of Guilt at Trial

In his opening statement, Jorgensen's defense counsel twice stated that Jorgensen took Davis's life and that the only issue before the jury was whether he acted with premeditation. He told the jury that he was not going to argue that drugs were an excuse for Jorgensen's behavior. He encouraged the jury to find Jorgensen guilty only of second-degree intentional murder. In his closing argument, defense counsel stated at least twice that Jorgensen intentionally killed Davis, but argued that the killing was not premeditated.

### D. References at Trial to Jorgensen's Violent History

During the state's direct examination of the chief officer investigating Davis's death, the following took place:

State: In the course of your investigation of this matter, did you have occasion to check to see whether James Jorgensen had ever been accused of or arrested of a violent crime?

Defense counsel: Objection, Your Honor.

Court: Sustained.

State: Did you, yourself, ever know James Jorgensen to be violent?

Defense counsel: Same objection, Your Honor.

Court: Sustained.

Shortly thereafter, Jorgensen's defense counsel approached the trial court seeking a mistrial. Defense counsel argued that a mistrial was required because the two questions relating to Jorgensen's history of violence implied that Jorgensen had a history of domestic violence and because the state had agreed before trial began that

there would be no evidence presented regarding Jorgensen's history as it related to violence. The court chastised the prosecutor, who in response explained that the questions were asked to raise doubt as to Jorgensen's intoxication defense by establishing that, even though Jorgensen had been using cocaine for years, he had never been violent before. The court denied the request for a mistrial, but did require that the state put the officer back on the witness stand and have him testify that Jorgensen had "never been accused, convicted of any violent crimes in his life" in order to dispel the impression left with the jury that Jorgensen had a history of violence. When the officer returned to the witness stand, the following question and answer were recorded:

> State: Detective, just one last question. Are you able to tell, based on your investigation, whether Mr. Jorgensen, the defendant in this matter, other than this case, has ever been charged with or convicted of a violent crime?
>
> Officer: Not that I have found.

### I.

■ The first question we address is whether the discovery of Davis's body was the result of a warrantless search in violation of the Fourth Amendment to the United States Constitution. The Fourth Amendment applies to searches by a private individual acting "as an instrument or agent of the [g]overnment." *Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Under the test this court adopted in *State v. Buswell*, we determine whether a private individual acts as an instrument or agent of the government in conducting a search by examining "(1) whether the government knew of and acquiesced in the search and (2) whether the search was conducted to assist law enforcement ef-

forts or to further the private party's own ends." 460 N.W.2d 614, 618 (Minn.1990) (citing *United States v. Walther*, 652 F.2d 788, 792 (9th Cir.1981)). If the government does not know of and acquiesce in the search, the search cannot be attributed to the government and the inquiry ends. *See id.* at 620. If the government knew of and acquiesced in the search, then we consider the purpose of the search, i.e., whether it was to assist law enforcement or for personal reasons. In the end, the determination of whether the private person acted as a government instrument or agent is a fact question to be determined by the trial court. *Id.* at 618. Here, the trial court found that the government acquiesced in the search but that Strickland was acting out of concern for her sister's welfare and not as an agent of the state. We will not overturn that determination unless clearly erroneous. *Id.*

■ In this case, the Minnetrista police knew of the search because they were present when it took place and the trial court found that the government acquiesced in the search. While the state makes a number of arguments contending that the officers did not acquiesce in the search, we cannot, on the facts before us, conclude that the trial court's determination was clearly erroneous. Mere acquiescence in the search does not automatically end our inquiry. We must proceed to the second prong of the *Buswell* test.

We know from the record that, other than standing by as Strickland broke into her sister's house and looking under the blanket when Strickland lifted it, the Minnetrista police had no role in the search. They did not know that Strickland was going to be at the house, arrange for her to be there, or plan to meet her there. Nor did they encourage Strickland to break into the house. Indeed, on at least two occasions, the officers told Strickland

that they could not be part of any search. It is clear from the record that Strickland was concerned about Davis's disappearance and was planning to break into the house long before the police arrived. Before going to the house, she talked about breaking into the house with other family members, at least one friend, and her lawyer. It was her son who suggested that the garage service door would be the easiest point of entry. Further, after the officers conducted their welfare check and told Strickland that there was nothing more they could do, Strickland told them that she was going to break into the house even if it meant being subject to arrest for the illegal entry.

Based on our review of the record and the trial court's findings, we cannot say that the trial court's finding that Strickland was not acting as a government instrument or agent was clearly erroneous. That the Minnetrista police acquiesced in the search does not alter our conclusion. Other than the officers' presence at the time Strickland broke into the house, they had no involvement in the search. As discussed above, they did not have any prior knowledge of Strickland's planned break-in, did not encourage her to break in, and took no active part in the break-in itself. We conclude that the trial court's finding that Strickland's search of the house was for purely personal reasons was reasonable.

## II.

We next address Jorgensen's contention that he was denied effective assistance of counsel because his attorney conceded his guilt by telling the jury throughout his trial that he intended to kill Davis. Jorgensen's attorney's strategy at trial was to concede that Jorgensen intended to kill Davis while at the same time attempting to convince the jury that the killing was without premeditation. This strategy was designed to increase credibility with the jury and to obtain an acquittal on the most serious charge against Jorgensen. Jorgensen claims that he never consented to this strategy and claims that it was unreasonable in light of his intoxication defense. He also claims that he never admitted to intending to kill Davis. Indeed, in the addendum to Jorgensen's pro se supplemental brief, Jorgensen claims:

> During opening and closing arguments I was shocked to hear my [p]ublic [d]efender Dan O'Brien state to the jury that: I intended to kill Shelby Davis, but it was not premeditated. Mr. O'Brien stated this more throughout my trial.

In *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court adopted a two-prong test for evaluating ineffective-assistance-of-counsel claims. Under that test, a defendant must show that his counsel's performance fell below an objective standard of reasonableness (the deficiency prong) and that, but for his counsel's error, there is a reasonable probability that the outcome of his trial would have been different (the prejudice prong). *Id.* at 687–94, 104 S.Ct. 2052. We have held that, when counsel for a defendant admits a defendant's guilt without the defendant's consent, the counsel's performance is deficient and prejudice is presumed. *See Dukes v. State,* 621 N.W.2d 246, 254 (Minn.2001); *State v. Wiplinger,* 343 N.W.2d 858, 861 (Minn.1984). That is so because the decision to concede a defendant's guilt is the defendant's decision alone to make. *Dukes,* 621 N.W.2d at 254. The defendant is entitled to a new trial unless he acquiesces in the concession. *See Dukes,* 621 N.W.2d at 254. We have held that a defendant acquiesces when defense counsel uses the strategy of conceding the defendant's guilt throughout trial and the defendant fails to object. *See*

*State v. Provost,* 490 N.W.2d 93, 97 (Minn. 1992). We have also held that the defendant acquiesces when admitting guilt was an "understandable" strategy, and the defendant was present at the time the concessions were made and admits that he understood that his guilt was being conceded, but did not object. *State v. Pilcher,* 472 N.W.2d 327, 337 (Minn.1991).

■ Here, the record indicates that Jorgensen's defense counsel's concessions on the issue of intent began with the opening statement and continued throughout the remainder of the trial, including closing argument. There is nothing in the record that indicates that Jorgensen consented to this trial strategy; thus, unless Jorgensen acquiesced in his counsel's concessions, he is entitled to a new trial.

Based on our review of the record, we are satisfied that Jorgensen knew and understood that his trial counsel was using the strategy of conceding his intent to kill Davis in an effort to avoid conviction on the first-degree murder charge while at the same time maintaining credibility, that the strategy was used throughout trial, and that Jorgensen never objected. On that basis, we conclude that Jorgensen acquiesced in the concessions made by his trial counsel. Because Jorgensen acquiesced in his defense counsel's concessions, we conclude that he is not entitled to relief on this issue.

### III.

■ Next, we consider whether the trial court erred in refusing to grant Jorgensen's request for a mistrial. Jorgensen argues that the state's examination of the chief investigating officer regarding whether Jorgensen had a propensity for violence was prejudicial to Jorgensen because it led the jury to reject the intoxication defense and convict Jorgensen based on character. We review a trial court's denial of a motion seeking a mistrial for an abuse of discretion. *State v. Spann,* 574 N.W.2d 47, 52 (Minn.1998).

In this case, defense counsel immediately objected to each of the offending questions and in each instance the trial court sustained the objection and no answer was given. After Jorgensen sought a mistrial, the prosecutor, when questioned by the court, explained that the questions were asked in order to cast doubt on Jorgensen's intoxication defense by establishing through the officer's response that Jorgensen had never become violent before despite years of drug use. The trial court denied the mistrial motion. However, because of lingering concerns that the jury might infer from the unanswered questions that Jorgensen had a propensity for violence, the trial court required the state to recall the officer to clarify that Jorgensen did not have a violent history. In addition, we note that the trial court instructed the jury at both the beginning and the end of Jorgensen's trial that the jury was to disregard questions to which the trial court sustained objections. We believe that the trial court's remedy of recalling the officer, coupled with the standard instruction given at the beginning and again at the end of trial, was sufficient to mitigate any harm caused by the prosecutor's improper questions. Therefore, we conclude that the trial court did not abuse its discretion in denying Jorgensen's mistrial motion.[1]

---

1. While we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial, we are concerned by the prosecutor's questions as to whether Jorgensen had a propensity for violence without first giving notice to the defense and seeking permission from the trial court as required by our rules. *See State v. Bolte,* 530 N.W.2d 191, 196–97 (Minn.1995). We are especially troubled given the agreement between the state and Jor-

## IV.

Finally, Jorgensen raises a number of other issues in his pro se brief. Specifically, he makes a number of additional arguments as to why he received ineffective assistance from his trial counsel and claims that his confession was not voluntary. Based on our thorough review of the record, we conclude that Jorgensen's trial counsel's performance was not deficient. We further conclude that Jorgensen's confession was voluntary.

Affirmed.

gensen's counsel, in the trial court's presence, that no such questioning would take place.