## STATE of Minnesota, Respondent,

v.

## Tyree Leland JACKSON, Appellant.

### No. A05–66.

Supreme Court of Minnesota.

June 1, 2006.

Hanson, J., concurred in the result with opinion in which Meyer and Paul H. Anderson, JJ., concurred.

John M. Stuart, State Public Defender, Sara L. Martin, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

PAGE, Justice.

A Hennepin County grand jury indicted appellant Tyree Leland Jackson for first-degree murder for the benefit of a gang, first-degree premeditated murder, second-degree murder for the benefit of a gang,

and second-degree intentional murder for the death of Thomas Olson. Jackson initially pleaded guilty to second-degree murder for the benefit of a gang and was later permitted to withdraw his guilty plea. After a trial, a Hennepin County jury returned guilty verdicts for aiding and abetting first-degree premeditated murder, aiding and abetting second-degree intentional murder, and aiding and abetting second-degree intentional murder for the benefit of a gang. The jury returned a verdict of not guilty for aiding and abetting first-degree premeditated murder for the benefit of a gang. Jackson was sentenced to life imprisonment for first-degree premeditated murder.

On appeal, Jackson raises five issues: (1) whether the prosecutor engaged in misconduct by eliciting inadmissible and prejudicial gang expert testimony; (2) whether the prosecutor engaged in misconduct by vouching for the state's witnesses and improperly injecting race into the closing argument; (3) whether the trial court erred when it submitted to the jury a special interrogatory regarding an aggravating factor for sentencing purposes; (4) whether he was denied his right to effective assistance of counsel; and (5) whether the cumulative effect of these alleged errors denied him a fair trial. We affirm.

On May 16, 2003, the victim, Thomas Olson, attended a party at 4725 Elliot Avenue in South Minneapolis with three of his friends, Roberto Aspholm, John Bobo, and Abdul Omari. The four drove to the party in two cars, with Bobo and Omari in Omari's car, and Aspholm and Olson in Olson's car. Arriving at approximately 10:30 p.m., they walked to the back porch of 4725 Elliot Avenue and entered the house.

Appellant Jackson and several of his friends attended the same party. The night of the party, Michael Earl McCaskel picked up Jackson, Alaiena Charlton, Alonna Charlton, and Nakeisha Ferguson and drove them to the party in his Bronco. Witnesses testified that all of these individuals were associated with the Bloods gang. On the way to the party, McCaskel stopped to pick up Martise Bowie, who was also associated with the Bloods. At Bowie's request, McCaskel made another stop at an alley near 38th Street and Chicago Avenue so Bowie could retrieve a gun. Alonna Charlton identified the gun as a "38 Western Silver" revolver.

Upon arriving at the party, Olson, Omari, Aspholm, and Bobo went downstairs to the basement where music was playing and people were dancing. Bobo recognized a few people at the party, including Stephens Wilburn, the Charlton sisters, and Ferguson, all of whom he believed were associated with the Bloods. Aspholm also observed that there were a number of gang members at the party. Omari, Aspholm, and Bobo testified that the three of them and Olson were not gang members.

After a few minutes in the basement, Omari, Olson, Bobo, and Aspholm went back upstairs. Once upstairs, they saw a fight break out. The Charlton sisters, members of a rival gang, and others were involved in the fight. Bobo, Olson, Omari, and Aspholm did not participate in the fight.

When the fight broke up, Bobo, Olson, Omari, and Aspholm attempted to leave the party. As they were doing so, Omari got into a confrontation with Jackson, which began when Jackson "grabbed [Omari's] pockets" as though he were going to rob Omari. Bobo stepped between Omari and Jackson and told Jackson that Omari was not looking for trouble. Jackson responded, "F that, this Blood gang" and then swung at Omari. At that point, several bystanders joined the ensuing fight. During this fight, Olson was knocked down and, according to Alaiena Charlton, at

some point the focus of the fight appeared to center on an effort to beat up Olson. Bobo testified that he thought Olson was targeted because he "didn't look like he fit in."

Bobo, Omari, and Aspholm extricated themselves from the fight and left the house. On their way out, Bobo and Omari saw a man wearing a black hooded sweatshirt standing near the door holding a 9–millimeter gun. Not noticing the gun, Aspholm punched the person holding the gun, and the three ran out of the house.

Once outside, Omari, Bobo, and Aspholm ran to Bobo's and Olson's cars. When they got to the cars, they realized that Olson was not with them and returned to the house to look for him. They ran in the front door, through the house, and out the back door. In the backyard, Omari stopped to look for his cell phone, which he had lost. As Bobo and Aspholm left the house and ran towards the front yard, they saw Olson running away from the house with two people chasing him. When Bobo and Aspholm caught up to Olson, the two people chasing him ran off. Both Charlton sisters identified Jackson as one of the two people chasing Olson. Alonna Charlton testified that Olson was pleading with Jackson to be left alone.

Olson and Aspholm got into Olson's car. As Olson drove away, heading south on Elliot Avenue, gunshots were fired at the car. Aspholm turned and saw a black male approximately six feet tall with a "light to medium complexion" wearing a black hooded sweatshirt shooting at the car. A single gunshot struck Olson in the head, and he slumped over the wheel. Olson died about five days later.

The police investigation of the shooting revealed that at least five shots were fired from two different guns, one a Colt .32 semi-automatic pistol and the other either a .38 revolver, a .357 revolver, or a 9–millimeter semi-automatic. Police concluded that either the .38 revolver, the .357 revolver, or the 9–millimeter semi-automatic inflicted the fatal wound.

A grand jury indicted Jackson for first-degree premeditated murder for the benefit of a gang, first-degree premeditated murder, second-degree intentional murder for the benefit of a gang, and second-degree intentional murder. After the indictment, Jackson pleaded guilty to second-degree murder for the benefit of a gang, but was subsequently permitted to withdraw his guilty plea based on his claim that he was not guilty and had been induced to enter the plea out of fear of receiving a life sentence at trial.

At trial, the state called the Charlton sisters, Wilburn, McCaskel, Omari, Bobo, Aspholm, and several police officers who worked on the case to testify. The state also called Ramsey County Deputy Sheriff Paul Meskan, a member of the Minnesota Gang Strike Force, as an expert witness on gangs. Jackson did not testify and did not call any witnesses in his defense.

At trial, Bobo, Alaiena Charlton, and Alonna Charlton each identified Jackson as one of the two people who shot at Olson's car, though their stories regarding the details of the shooting varied somewhat. The other person identified as a shooter was Bowie. The Charlton sisters' testimony was part of a plea agreement with the state stemming from assault charges that arose out of their part in the first fight at the party. They both testified that they were near McCaskel's Bronco when they saw Jackson, who was standing next to the Bronco, pull out a gun and shoot several times at Olson's car as it drove past. After Jackson fired his gun, Alaiena Charlton heard a window break and then a car crash. Both Charlton sisters further testified that Bowie, who was also standing

next to the Bronco, fired his gun at Olson's car after Jackson finished shooting. Though McCaskel too was near the Bronco at the time of the shooting, he testified that he did not see the shooters. However, McCaskel stated that Jackson later told him that Jackson had "unloaded" on Olson's car.

After the shooting, Jackson, the Charlton sisters, McCaskel, and Bowie drove off in McCaskel's Bronco. Soon after driving away, McCaskel stopped the Bronco, and Wilburn came up to the Bronco on foot. Bowie passed a gun from the Bronco to Wilburn, and Wilburn later dumped the gun in a trash can. Alonna Charlton identified the gun as the .38 revolver she had seen Bowie with earlier. Jackson had a second gun in the Bronco, which he did not give to Wilburn. Alaiena Charlton testified that McCaskel attempted to return to the party house after the shooting to pick up another person, but that Jackson opposed the idea, saying, "Don't go back there and try to have me in jail. I just got done shooting."

The Charlton sisters' trial testimony implicating Jackson in the shooting contradicted their initial statements to police in which Alaiena Charlton stated that she did not know who the shooters were, and Alonna Charlton identified people other than Jackson and Bowie as the shooters. At trial, the sisters testified that they lied initially because they were afraid of reprisals from gang members.

Bobo testified that he was standing near Omari's car when he heard someone scream "Martise, no" and saw an individual running and firing a gun at Olson's car. Bobo then saw a second person, whom he later identified as Jackson, step off the sidewalk approximately seven or eight feet from Olson's car and shoot into the car. After the shooting, Bobo observed one of the shooters getting into a Bronco but did not see where the other shooter went.

In his testimony, Meskan, the state's gang expert, discussed the Bloods gang generally, describing their territory and identifying hand signs and colors. He testified that the primary purpose of the Bloods gang is "to conduct criminal activities" and described the types of crimes that Bloods members commit. In addition, Meskan testified about the roles of respect and intimidation in Bloods culture. He explained that Bloods members earn respect within the gang by committing crimes.

Meskan testified that, in his opinion, Olson was "murdered for the sake of the Bloods, [for] showing disrespect." He stated that a person who is not a gang member and who "shows up some place where there is all gang members there" and appears unwilling to fight would be viewed as showing disrespect to the gang. In addition, Meskan testified that Jackson, the Charlton sisters, Wilburn, McCaskel, Ferguson, and Bowie were all associated with the Bloods gang. Jackson's counsel did not object to any of this testimony.

On cross-examination, Jackson's counsel questioned Meskan at length regarding the basis for his conclusion about Jackson's gang membership, eliciting testimony about the ten criteria used by the Minnesota Gang Strike Force to determine gang affiliation and that Jackson met three of the ten criteria, qualifying him as a gang member. On redirect, the state elicited additional details regarding the ten criteria.

As part of the verdict forms given to the jury, the district court included a special interrogatory regarding an aggravating factor to be used for sentencing purposes. The special interrogatory read, "Did the state prove beyond a reasonable doubt that the defendant or co-defendant posed a

great danger to the safety of people other than Thomas Olson?" The interrogatory was included on the "verdict of guilty" forms for each crime charged. The jury answered the interrogatory in the affirmative for the three counts of which the jury found Jackson guilty. Jackson's counsel did not object to the special interrogatory.

## I.

We first address Jackson's contention that the state committed misconduct when it introduced Meskan's testimony about gang culture and Jackson's gang membership because the testimony was inadmissible, prejudicial, cumulative, and unhelpful. Jackson also challenges the state's introduction of Meskan's opinion on the ultimate issue of whether Olson's murder was committed for the benefit of a gang. Jackson further argues that Meskan's testimony was improper because it was based on hearsay.

In response, the state argues that Jackson has waived any objection to Meskan's testimony by failing to object to it at trial and that, even if not waived, the alleged error does not satisfy the plain error standard. The state contends that Meskan's testimony was admissible because it was helpful to the jury in deciding an element of the crime charged—whether Olson's murder was for the benefit of a gang. The state further argues that Meskan's testimony was necessary and was not unduly inflammatory.

At trial, Jackson did not object to the introduction of any of the now-complained-of testimony by Meskan. While failure to object to the admission of evidence generally constitutes a waiver of the right to appeal on that basis, this court has discretion to consider an error not objected to at trial if it is plain error affecting substantial rights. *State v. Taylor*, 650 N.W.2d 190, 205 (Minn.2002); *State v.*

*Griller*, 583 N.W.2d 736, 740, 742 (Minn. 1998). We apply a three-prong test when making a plain error determination: "before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights." *Griller*, 583 N.W.2d at 740. To satisfy the second prong, the error must be plain at the time of the appeal. *State v. Ihle*, 640 N.W.2d 910, 917 (Minn.2002). An error is "plain" if it is clear or obvious. *Id.* The third prong of the test is satisfied if "the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 744. Error is prejudicial if there is a " 'reasonable likelihood' " that the error " 'had a significant effect' " on the jury's verdict. *Id.* (quoting *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)). If any prong of the test is not met, the claim fails. *See id.* at 740. If the three prongs of the plain error test are met, "the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* A court will correct the error "only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected." *State v. Morton*, 701 N.W.2d 225, 234 (Minn.2005).

It is improper for a prosecutor to intentionally elicit inadmissible and highly prejudicial testimony. *State v. Henderson*, 620 N.W.2d 688, 702 (Minn.2001). Under Minn. R. Evid. 702, expert testimony is admissible if it will assist the jury in evaluating evidence or resolving factual issues. Further, Minn. R. Evid. 704 permits opinion testimony as to ultimate issues. Nonetheless, Minn. R. Evid. 403 provides that otherwise admissible evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

We have addressed the issue of gang expert testimony in three recent cases. *State v. Blanche*, 696 N.W.2d 351 (Minn.2005); *State v. DeShay*, 669 N.W.2d 878 (Minn.2003); *State v. Lopez–Rios*, 669 N.W.2d 603 (Minn.2003). In these cases, we expressed concern that expert testimony regarding gang activity often is neither helpful nor necessary and can be highly prejudicial, due to the potential for experts to unduly influence the jury. *Blanche*, 696 N.W.2d at 374; *DeShay*, 669 N.W.2d at 886; *Lopez–Rios*, 669 N.W.2d at 612–13. Further, expert testimony regarding gang activity unrelated to the specific crime with which a defendant is charged "places the defendant in the position of defending allegedly criminal activities of others." *DeShay*, 669 N.W.2d at 887. Thus, we have observed that the mere fact that criminal gang involvement is an element of the crime charged does not open the door to unlimited expert testimony about gangs. *Id.* at 886. To be admissible, gang expert testimony "must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience." *Id.* at 888. Despite our concerns, however, we have never categorically prohibited the use of gang expert testimony. *See id.* at 886.

To address some of our concerns with gang expert testimony, we recommended that firsthand-knowledge testimony be used to prove the "for the benefit of a gang" element when feasible. *See id.* In such situations, expert testimony that is largely duplicative of firsthand knowledge testimony should be avoided. *See Lopez–Rios*, 669 N.W.2d at 612. In addition, while Minn. R. Evid. 704 does permit opinion testimony as to ultimate issues, we have expressed our disapproval of the use of expert testimony to prove by opinion the gang membership of a defendant. *Lopez–Rios*, 669 N.W.2d at 612–13. Thus,

expert testimony may be excluded when it "would merely tell the jury what result to reach." *Id.* at 613. Further, as to hearsay, we have cautioned against the use of gang expert testimony that is based largely on hearsay. *See DeShay*, 669 N.W.2d at 886 ("[T]he state should not be permitted to launder inadmissible hearsay evidence, turning it into admissible evidence by the simple expedient of passing it through the conduit of purportedly 'expert opinion.'").

In *Blanche*; *DeShay*, and *Lopez–Rios*, we concluded that, while the admission of some portions of the gang expert testimony was error, the error in each case was harmless because it did not substantially influence the jury's decision. *Blanche*, 696 N.W.2d at 374; *DeShay*, 669 N.W.2d at 888; *Lopez–Rios*, 669 N.W.2d at 613. In each case, multiple witnesses with firsthand knowledge testified that the defendant was a gang member and that the crime charged was related to gang activities, adequately establishing the gang connection even without the expert testimony. *Blanche*, 696 N.W.2d at 374; *DeShay*, 669 N.W.2d at 888; *Lopez–Rios*, 669 N.W.2d at 613.

Jackson was indicted for first-degree murder for the benefit of a gang, among other offenses. To prove that Olson's murder was "for the benefit of a gang," the state had to establish that the Bloods gang satisfies the statutory definition of a criminal gang and that Olson's murder was committed "for the benefit of, at the direction of, in association with, or motivated by involvement with [the Bloods gang], with the intent to promote, further, or assist in criminal conduct by gang members." Minn.Stat. § 609.229 (2004). Section 609.229 defines a "criminal gang" as

any ongoing organization, association, or group of three or more persons * * * that: (1) has, as one of its primary activities, the commission of one or more of

the offenses listed in section 609.11, subdivision 9 [including, inter alia, murder, assault, burglary, kidnapping, manslaughter, robbery, and drive-by shooting]; (2) has a common name or common identifying sign or symbol; and (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Meskan, the state's gang expert, testified about the Bloods gang generally, discussing the gang's identifying hand signs and colors and the criminal activities in which Bloods gang members are involved. Meskan also testified about the role of respect in Bloods culture. In addition, Meskan stated that Jackson was associated with the Bloods gang and that, in his opinion, Olson was "murdered for the sake of the Bloods, [for] showing disrespect."

On cross-examination, Jackson's counsel questioned Meskan regarding the basis for his conclusion about Jackson's gang membership, eliciting testimony about the ten criteria used by the Minnesota Gang Strike Force to determine gang affiliation. Meskan's testimony on cross-examination revealed that he based his conclusion about Jackson's gang membership largely on statements made to police by Bobo and the Charlton sisters in which they identified Jackson as a Bloods member.

■ Meskan's testimony about the general criminal activities of Bloods gang members was admissible because it assisted the jury in deciding whether the commission of crimes is one of the primary activities of the Bloods gang, a prerequisite for proving that the Bloods gang meets the statutory definition of a "criminal gang." Minn.Stat. § 609.229. This testimony was necessary to establish that Olson's murder was "for the benefit of a gang." *See* Minn.Stat. § 609.229. Meskan's testimony on this point was not needlessly cumulative because only two

other witnesses—the Charlton sisters—testified about the criminal activities of the Bloods, and both did so with little precision.

Meskan's testimony about the role of respect in gang culture was also helpful to establish the "for the benefit of a gang" element and to explain the state's theory of motive. Although motive is not a required element of first-degree murder, the state may prove that a crime was committed "for the benefit of a gang" by showing that the crime was "motivated by involvement with a criminal gang," rendering evidence of motive critical to the state's case. Minn.Stat. § 609.229, subd. 2. Because jurors are unlikely to be familiar with gang culture, Meskan's testimony provided useful context for the state's theory as to why Jackson would attack a person who was seeking to avoid a fight. In addition, Meskan's testimony about gang culture and the Bloods gang was neither belabored nor excessive.

Further, while Meskan's testimony about gang culture and the Bloods gang may have posed some risk of prejudice, it did not require exclusion under Minn. R. Evid. 403 because it had significant probative value. Most evidence introduced to prove the "for the benefit of a gang" element is likely to be improperly prejudicial to some degree by suggesting guilt based on gang membership alone. But prohibiting all such evidence would frustrate the legislature's purpose in enacting section 609.229 by rendering convictions under it nearly impossible to obtain.

■ As to the hearsay issue, the state did not actually elicit any hearsay testimony from Meskan. Instead, the hearsay statements complained of by Jackson—statements Meskan testified that the Charlton sisters and Bobo had made to police—were elicited by Jackson's own

counsel on cross-examination. Nonetheless, as noted above, we have cautioned against the use of gang expert testimony that is based largely on hearsay, as was Meskan's opinion regarding Jackson's gang membership. *See DeShay*, 669 N.W.2d at 886. Our concern with laundering hearsay through expert testimony, however, is not implicated in this case because most of the hearsay statements on which Meskan based his opinion were introduced at trial in the form of firsthand witness testimony by the Charlton sisters and Bobo. Thus, Meskan's testimony about statements that the Charlton sisters and Bobo made to police did not introduce evidence that would not otherwise have come to the jury's attention.

 While it may have been error to introduce certain other portions of Meskan's testimony, particularly portions that were cumulative of firsthand witness testimony and Meskan's opinion as to the ultimate issue in the case, reversal is not warranted because any such error did not affect Jackson's substantial rights. As in *Blanche*; *Lopez–Rios*, and *DeShay*, there was ample firsthand-knowledge testimony in this case linking Jackson to the Bloods gang and identifying him as one of the shooters. Alaiena Charlton, Alonna Charlton, and McCaskel all testified that Jackson was associated with the Bloods at the time of the shooting. Three witnesses testified that they saw Jackson fire at Olson's car, and a fourth witness testified that Jackson later admitted to being one of the shooters. In addition, two witnesses testified that Jackson was involved in an altercation with Olson and his friends during which Jackson identified himself with the Bloods gang. Witnesses also testified that Jackson fled the party with other Bloods members after the shooting and gave one of the guns used in the shooting to another gang member for disposal. Further, Alonna Charlton testified that Jackson and Bowie were chasing Olson shortly before he was killed.

Meskan's testimony, therefore, simply corroborated the testimony of numerous witnesses and likely was no more influential than much of the other evidence presented linking Jackson to the Bloods and to the shooting. Thus, while Meskan's testimony may have brought the weight of expert opinion to bear on the gang issues, we conclude that it did not have a significant effect on the jury's verdict. Thus, any error in the admission of Meskan's testimony did not affect Jackson's substantial rights, and Jackson's claim fails.

## II.

Jackson argues that the state committed misconduct in its closing argument by injecting irrelevant racial issues, inviting the jurors to compare their world to the "gang world," and appealing to the passions and prejudices of the jury. Specifically, Jackson complains of the statement: "Olson in particular was targeted for many reasons. He did not look like the others at the party. He was white. He didn't dress like them. He was a college student. He didn't act like them." In addition, Jackson points to the statement: "The gang world operates under a whole different set of rules." Jackson also challenges the comments:

This jury must acknowledge and understand how gangs work in order to understand what happened that night to Tom Olson and why he was killed. It's a safe bet to say that outside of the gang world when a person starts a fight and another person runs away or doesn't fight back, that person is victorious and the fight ends. But here you have a victim that wanted to be peaceful, who refused to fight back, who wanted to get away. This is the gang world and the

Bloods thrive on intimidation and fear. They demand respect.

Jackson asserts that these statements deprived him of a fair trial because they invited the jury to consider improper factors in reaching its verdict. In opposition, the state contends that the statements made in closing argument were proper because they explain the motive for Olson's murder, a topic suitable for consideration by the jury, and did not unnecessarily inject issues of race.

 Because Jackson did not object at trial to the portions of the prosecutor's closing argument that he now claims constituted misconduct, we again apply the plain error standard of review.[1] *See Blanche*, 696 N.W.2d at 375. When reviewing claims of prosecutorial misconduct arising out of closing arguments, "we consider the closing argument as a whole rather than focus on particular 'phrases or remarks that may be taken out of context or given undue prominence.'" *State v. Johnson*, 616 N.W.2d 720, 728 (Minn.2000) (quoting *State v. Walsh*, 495 N.W.2d 602, 607 (Minn.1993)).

 It is improper for a prosecutor to appeal to the passions and prejudices of the jury or otherwise seek to distract the jury from its proper role of deciding whether the state has met its burden of proof. *Morton*, 701 N.W.2d at 236; *State v. Ashby*, 567 N.W.2d 21, 27 (Minn.1997). "When credibility is a central issue, we pay special attention to statements that may inflame or prejudice the jury." *Morton*, 701 N.W.2d at 236. In particular, we have repeatedly noted that "it is improper to inject race into a closing argument when race is not relevant." *State v. Cabrera*, 700 N.W.2d 469, 474 (Minn.2005); *see also State v. Clifton*, 701 N.W.2d 793, 800 (Minn.2005); *State v. Ray*, 659 N.W.2d 736, 747 (Minn.2003). "In cases where race should be irrelevant, racial * * * considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." *Ray*, 659 N.W.2d at 747 (quoting *State v. Varner*, 643 N.W.2d 298, 304 (Minn.2002)); *see also Cabrera*, 700 N.W.2d at 475.

In *State v. Ray*, we discussed a prosecutor's remarks during closing that invited jurors to compare the world of "three young black males in the hood" to the jurors' world and to wealthier suburban neighborhoods. *Ray*, 659 N.W.2d at 746 ("This is not a dispute between a businessman or a businesswoman from Edina and another businessman or businesswoman from Minnetonka. This is a dispute * * * involving three young black males in the hood in North Minneapolis. This is not your environment, this is the Defendant's environment."). We noted that "[s]uch an invitation asks the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial." *Id.* at 747. We concluded that these comments constituted prosecutorial misconduct, but did not decide whether they alone would have warranted reversal because other independent grounds for reversal existed. *See id.* at 746 n. 3, 747.

---

1. While, as noted previously, we have discouraged the use of gang expert testimony and have repeatedly cautioned against improper closing arguments, we emphasize that defense counsel bears the responsibility of timely objecting to such alleged misconduct to give the trial court an opportunity to rectify the error, if any. We are concerned about the motive for defense counsel's failure to object in cases such as this. Defense counsel may not attempt to get two bites at the apple by failing to object at trial and then seeking a new trial based on plain error if the first trial does not produce the desired verdict. *See State v. Ray*, 659 N.W.2d 736, 747 n. 4 (Minn.2003).

In contrast, we have held that a prosecutor's statement observing that a defendant is not from the same world as the jurors and distinguishing the defendant from "a businessman from Edina, Pope John Paul and Mother Teresa" was not misconduct. *State v. Robinson*, 604 N.W.2d 355, 363 (Minn.2000). In *Robinson*, we concluded that "these comments did little more than prepare the jury for evidence of an unfamiliar world involving drugs." *Id.*

More recently, we addressed lengthy remarks made in the state's closing argument that called on the jury to consider "how different your lives may be from the lives and lifestyles of many of the people who testified before you and from the victim." *Clifton*, 701 N.W.2d at 799. In *Clifton*, we concluded that the prosecutor's remarks were misconduct because they "were demeaning" and "came close to appealing to passion and prejudice." *Id.* at 800. As in *Ray*, the improper statements in *Clifton* invited " 'jurors to view a defendant as coming from a different community than themselves.' " *Id.* (quoting *Ray*, 659 N.W.2d at 747). However, in *Clifton* we determined that a new trial was not warranted because, "unlike *Ray*, there was no explicit reference to race or use of race to disparage the defendant." *Clifton*, 701 N.W.2d at 800.

▆ Here, the statements challenged by Jackson did not constitute misconduct. The prosecutor's remarks about the "gang world" simply served to introduce the state's argument regarding the role respect played in the motive for Olson's murder. As with the drug world in *Robinson*, the roles of respect and reprisal in gang culture may be unfamiliar to the average juror. The prosecutor's comments were directed at explaining Jackson's seemingly inexplicable response to Olson's refusal to fight. A juror may not have understood why someone like Olson, who was attempting to flee a conflict with gang members, would nonetheless be shot and killed. Further, and importantly, the prosecutor in this case did not urge the jurors to compare their world to that of the defendant.

▆ Moreover, as in *Clifton*, race was not used to disparage the defendant. The sole reference to race in the state's closing argument was the comment that Olson was white. Olson's race was listed as just one of the many reasons why he was targeted at the party, bolstering the state's theory of motive. This statement was supported by the evidence admitted at trial. Bobo testified that people involved in the second fight at the party focused on Olson because "he was the person that was there that didn't look like he fit in." The state's comments regarding Olson's characteristics—including his race—merely served to explain this testimony. In addition, Alaiena Charlton mentioned Olson's race during her testimony, referring to him as the "white boy." Further, Aspholm testified that the party was, for the most part, "an all-black party." Given this context, it is unlikely that the state's single comment about Olson's race, accompanied by a list of other characteristics, inflamed the prejudices of the jury or distracted it from its proper role. Thus, we hold that the state's reference to Olson's race was not misconduct.

▆ Jackson also argues that the state improperly vouched for its witnesses during closing argument. Jackson contends that the state's comments about the Charlton sisters' fear of reprisal for "snitching" constituted vouching. Jackson specifically points to the statements:

> You must ask yourselves what had Alaiena Charlton and Alonna Charlton or even Michael McCaskel or Stephens Wilburn to gain by testifying here.

They know what a snitch is. They know what happens to snitches. They know how blood [sic] gang members deal with snitches. * * * Make no mistake, members of the jury, what interest do they have in the outcome of this case? By testifying they have absolutely nothing to gain.

Jackson also takes issue with the prosecutor's statement in closing: "Members of the jury, do you think the police are so naïve or so stupid that if they had evidence against McCaskel to charge him in a murder that they would let him walk? There's no evidence that McCaskel was the shooter." Jackson claims that this statement constituted vouching. Jackson argues that these comments, taken together, prejudiced his case by diverting the jury's attention from its proper role.

■■■■ A prosecutor may not personally endorse the credibility of a witness or impliedly guarantee a witness's truthfulness. *See State v. Patterson*, 577 N.W.2d 494, 497–98 (Minn.1998); *State v. Porter*, 526 N.W.2d 359, 364 (Minn.1995). In closing argument, however, the state may argue that certain witnesses were or were not credible. *Lopez–Rios*, 669 N.W.2d at 614.

The prosecutor's comments that the Charlton sisters had nothing to gain, and something to lose, by testifying against Jackson did not rise to the level of vouching and thus were not misconduct. These comments simply noted the sisters' lack of bias by observing that their testimony was not self-serving. They also served to explain the inconsistencies between the Charlton sisters' initial statements to police and their trial testimony, something that Jackson's trial counsel emphasized in closing argument. Further, the prosecutor never implied that Jackson was responsible for the Charlton sisters' fear or that Jackson himself had made any threats

against them. Consequently, we hold that the prosecutor did not engage in impermissible vouching.

■■■■ Jackson's claim that it was misconduct for the state to comment that the police were not so stupid as to let McCaskel go free if they had evidence against him also fails. This statement was not vouching because it did not purport to guarantee the credibility of a witness. *See Lopez–Rios*, 669 N.W.2d at 614. Instead, the statement merely sought to refute defense counsel's suggestion that McCaskel, rather than Jackson, may have been one of the shooters, a subject proper for consideration by the jury.

### III.

In response to *Blakely v. Washington*, which was decided by the United States Supreme Court in June 2004, the district court in this case submitted a special interrogatory to the jury requesting that the jury determine whether a particular aggravating factor was present. *See Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding that an upward departure from a presumptive guidelines sentence may not be based on judicial findings of fact). The district court intended to use the aggravating factor in sentencing Jackson if he were sentenced pursuant to the Minnesota Sentencing Guidelines.

On appeal, Jackson argues that because Minn.Stat. § 244.10 (2004) and Minn. Sent. Guidelines II.D. require a judge to make the fact findings necessary for upward departures in sentencing, the district court cannot authorize a jury to make such findings. The state disagrees, arguing that, because Minnesota courts have inherent authority over matters of court procedure, it was proper for the district court to fashion a procedure to implement the *Blakely* decision.

Jackson failed to object to the use of the special interrogatory. Therefore, we review his claim under the plain error standard. *See Blanche,* 696 N.W.2d at 377. Because we conclude that Jackson cannot establish that the alleged error affected his substantial rights, we need not decide whether the trial court's use of the special interrogatory constituted error that was plain.

The trial court's use of the special interrogatory to have the jury find the aggravating factor did not affect Jackson's substantial rights because, in the end, Jackson was not sentenced under the sentencing guidelines. The sentence for first-degree premeditated murder is not determined using the sentencing guidelines. Rather, Minn.Stat. § 609.185 (2004) provides a mandatory sentence of life imprisonment for first-degree murder. Therefore, the aggravating factor was not used to make an upward departure in Jackson's sentence.

Nor is there any evidence that the special interrogatory distracted the jury from its role of analyzing the elements of the crimes charged. The district court judge properly instructed the jury on the elements of each of the crimes charged and the state's burden of proof. The fact that the jury, during its deliberations, sought clarification of the difference between "premeditated" and "intentional" indicates that the jury was carrying out its duty to evaluate the elements of the crimes charged. Further, the jury did not find Jackson guilty on all counts, despite the fact that the aggravating factor was included on the verdict form for each count, suggesting that the jury was not unduly swayed by the presence of the interrogatory. Finally, the aggravating factor submitted to the jury—whether Jackson posed a great danger to the safety of people other than Olson—did not expose the jury to evidence that was not otherwise properly before it. Because the use of the special interrogatory did not affect Jackson's substantial rights, we hold that Jackson is not entitled to a new trial on that ground.

IV.

Jackson also argues that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel failed to object to repeated instances of prosecutorial misconduct and to the use of the special interrogatory. Jackson contends that an objectively reasonable attorney would have been familiar with *DeShay; Lopez–Rios,* and *Ray* and consequently would have objected to the inadmissible gang expert testimony and the prejudicial closing argument. Jackson further argues that it is reasonably probable that he would have been convicted only of second-degree murder or would have been acquitted altogether had his counsel made proper objections. In opposition, the state claims that Jackson's counsel's failure to object was a strategic decision and that Jackson has failed to meet his burden of proof on his ineffective-assistance-of-counsel claim.

In order to demonstrate ineffective assistance of counsel, an appellant must show that the representation "'fell below an objective standard of reasonableness'" (performance prong) and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'" (prejudice prong). *State v. Martin,* 695 N.W.2d 578, 587 (Minn.2005) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *State v. Jones,* 392 N.W.2d 224, 236 (Minn.

1986)). There is a "strong presumption that counsel's performance was reasonable." *Id.* "The appellant bears the burden of proof on an ineffective assistance of counsel claim." *State v. Miller,* 666 N.W.2d 703, 716 (Minn.2003). A court may address the two prongs of the test in any order and may dispose of the claim on one prong without analyzing the other. *See State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003).

Here, having already concluded that Jackson's prosecutorial-misconduct claims fail because the alleged misconduct did not in fact constitute misconduct, or, to the extent that misconduct did occur, it did not result in prejudice to Jackson, we conclude that Jackson cannot satisfy the prejudice prong of *Strickland.* Therefore, his ineffective-assistance-of-counsel claims related to prosecutorial misconduct fail. Further, we have already determined that the use of the special interrogatory did not result in prejudice to Jackson. Consequently, his ineffective-assistance-of-counsel claim related to the use of the special interrogatory also fails on the prejudice prong.

## V.

Finally, Jackson argues that the cumulative effect of the alleged errors deprived him of his due-process right to a fair trial by distracting the jury from its proper role. Jackson contends that absent the complained-of errors "the jury may have reached a different verdict." An appellant is "entitled to a new trial if the errors, when taken cumulatively, had the effect of denying appellant a fair trial." *State v. Keeton,* 589 N.W.2d 85, 91 (Minn. 1998). Having carefully reviewed the record, we are satisfied that, to the extent any errors occurred in this case, Jackson was not denied the right to a fair trial.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

HANSON, Justice, concurring.

Although I concur in the affirmance of Jackson's conviction, I write separately because I would reach that result by different means.

As to the gang expert testimony, Jackson curiously did not argue that the district court erred in admitting the testimony, but only that the state committed prosecutorial misconduct by offering it. By limiting his argument in this way, Jackson has imposed on himself a higher threshold than plain error. In addition to showing that the evidence was plainly inadmissible and sufficiently prejudicial to affect his substantial rights, Jackson must also show that the state had no good-faith basis to argue for admissibility and elicited the testimony knowing that it was inadmissible. *See State v. White,* 295 Minn. 217, 223, 203 N.W.2d 852, 857 (1973). Because our prior decisions do not establish absolutely clear boundaries on gang expert testimony, I conclude that Jackson failed to meet this higher threshold.

If the court, nevertheless, wishes to directly address the admissibility of the gang expert testimony, I would restrict, even further than the majority, the scope of admissible testimony. In fact, I would conclude that virtually none of Officer Meskan's testimony was admissible because, first, insufficient foundation was laid to qualify Officer Meskan as an expert; second, several of his opinions were based on incompetent, anecdotal evidence; and third, the effect of his testimony was to supply character evidence that is prohibited by Minn. R. Evid. 404(a) or other

crimes evidence that does not meet the requirements of Minn. R. Evid. 404(b). The more difficult question is whether we should exercise our discretion to apply a plain error test. My review of the record suggests that Jackson's counsel was pursuing a strategy to capitalize on the gang expert testimony. Not only did he not object to a single question in the extended examination of Officer Meskan, he engaged the officer in a detailed cross-examination about the gang criteria, apparently believing that the officer's analysis was weak and could be exploited for Jackson's benefit. I would decline to apply the plain error test to a situation where, as here, counsel deliberately forgoes an objection and then affirmatively develops and expands the evidence on cross-examination.

Finally, because I question the wisdom of defense counsel's strategy in dealing with gang testimony, I would focus the ineffective assistance of counsel claim somewhat differently. For me, the question is whether defense counsel's strategy, to not object to gang expert testimony and then to attempt to capitalize on it on cross-examination, was a reasonable strategy or was one that Jackson acquiesced in. *See, e.g., State v. Jorgensen,* 660 N.W.2d 127, 132–33 (Minn.2003) (rejecting the claim that counsel's concession of intent to kill, in order to defeat the charge of premeditation, because the defendant acquiesced in the concession). Because I cannot answer these questions from the trial record, I would preserve the issue for review by postconviction petition.

On the scope of permissible gang expert testimony, I conclude that it is time for the court to provide greater supervision on this issue. We have been cautious in examining the first several cases under the "crime committed for the benefit of a gang" law, recognizing that the state may have difficulty proving the gang elements

and waiting to see how the state may present its proof. But we have now reviewed enough cases to recognize the serious issues raised by this type of gang expert testimony and we need to both clarify the rules concerning its admissibility and consider mechanisms to mitigate against any unfair prejudice to the defendant.

It may be true that, under the circumstances of a given case, it will be difficult to prove that the underlying crime was committed for the benefit of a gang. But I do not find any basis to conclude that the legislature, when it enacted the gang legislation, intended to modify the conventional rules of evidence or otherwise relax the state's burden of proof. And it must be remembered that any difficulty with the proof of the gang elements does not leave the state without legal recourse because gang involvement is not an independent crime but enhances the penalty for another underlying crime. Minn.Stat. § 609.229, subds. 3, 4 (2004). Thus, in cases where gang involvement cannot be proven by admissible evidence, the state can still proceed with the prosecution of the underlying crime. In the murder context, this is similar to the situation where the state has evidence to prove an intentional killing but not premeditation. The fact that admissible evidence of premeditation cannot be found does not justify the relaxation of the rules of evidence to allow inadmissible evidence.

Under Minn. R. Evid. 702, the threshold question, before getting to whether the testimony will "assist the trier of fact," is whether the witness qualifies as an expert. The rule requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education." I do not doubt that the organization of gang strike forces and the collection of anecdotal information about gangs contributes to

the effectiveness of the investigation of gang-related crimes. But I doubt whether the experience gained and the information collected qualifies as "expertise" within the contemplation of Rule 702. My concern is whether the unscientific and unsystematic collection of anecdotal information about gangs can be construed to be "scientific, technical, or other specialized knowledge" that can then be applied as a standard to evaluate the activities of a specific defendant and his or her associates.

This deficiency in Officer Meskan's testimony is comparable to the deficiency that we recognized in *State v. Williams*, where we held that "drug courier profiles" that contain an "informally compiled abstract of characteristics thought typical of persons carrying illicit drugs," do not qualify as "scientific" information for purposes of expert testimony. 525 N.W.2d 538, 545, 547 (Minn.1994) (quoting *United States v. Mendenhall*, 446 U.S. 544, 547 n. 1, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). We said:

> This is not to say that a reasonable and prudent police officer or DEA agent is not free to keep a mental checklist of possibly relevant factors bearing on their important role in intercepting drug couriers. It is simply to say that drug courier profiles are not "scientific" in any sense of the word, that agents may not mechanically rely on them in making investigative decisions affecting the constitutional privacy interests of citizens, and that reviewing courts also must not engage in a mechanistic deference to police testimony that the defendant's conduct fit some profile.

*Id.* at 547. I would conclude that a law enforcement officer who specializes in gang investigations cannot thereby bootstrap himself into becoming a qualified expert witness on gangs and then be allowed to extrapolate from general and randomly obtained information to interpret the activities of a given defendant.

Further, even if Officer Meskan had qualified as an expert, the data on which he based his opinions was not independently admissible and was not shown to be of a type that could reasonably be relied upon by experts in the field. Although Officer Meskan stated that he has been involved in or reviewed hundreds of investigations of gang activities and interviewed numerous persons about gang activities, there is no way to determine whether the information he collected was accurate or whether it had general applicability to other situations.

Finally, the use of generalized testimony about the activities of gangs has the inevitable effect of being character evidence because it is offered to show not only the propensities of gangs but, by association, the propensities of a defendant who is said to be a gang member. Specifically, the discussion of the range of crimes committed by gangs represents both character evidence that is inadmissible under Rule 404(a) and other crime evidence that is admissible only if it meets the clear and convincing evidence requirement under Rule 404(b). In *Williams*, we recognized this same deficiency in drug courier profile evidence, quoting these observations by Professor Graham:

> Normally proof of character involves witnesses who generalize on the basis of past acts of the defendant and this generalization is used to support an inference as to the conduct in issue. The drug courier profile involves a generalization based on the past acts of third persons. The jury is asked to infer from the fact that the defendant shares some of the characteristics of these third persons that he shares their guilt of drug smuggling.

525 N.W.2d at 547–48 (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure—Evidence* § 5233, at n. 53.2 (Interim ed. 1992 and Supp. 1994)). We determined that the drug courier profile evidence was "clearly and plainly inadmissible." *Id.* at 548.

These deficiencies in Officer Meskan's testimony are most seriously present with respect to his opinions that (1) the purpose of the Bloods gang is to commit crimes; (2) the types of crimes the gang commits include murder, assault, kidnapping, robbery, and weapons offenses; (3) specific members of the Bloods gang have a history of committing these types of crimes; (4) gang members have a need to assert their power and to intimidate others so as to be shown "respect"; (5) guns are reasonably available to gang members, often carried by juvenile gang members; (6) gang members wear black hooded sweatshirts (hoodies) to conceal their identity and discard them when they have gun residue on them; and (7) the refusal to fight against a gang member is seen as a sign of disrespect for which retaliation is warranted. Further, as acknowledged in the majority opinion, Meskan's testimony that was cumulative of first-hand witness testimony and that opined on the ultimate issues of Jackson's motives was inadmissible.

Although the state may view this evidence as being "necessary" to prove that the murder was for the benefit of a gang, such necessity does not make it admissible. Because the legislature expressed no intent to change the rules of evidence concerning proof of gang involvement, I would not conclude that the application of conventional rules of evidence could be seen as frustrating the legislature's purpose in enacting the gang laws. I conclude that the legislature's purpose was to discourage gang activities by increasing the punishment for a crime where it could be proven that the crime was committed for the benefit of a gang. Here, as in many cases, the state offered proof through witnesses with first-hand knowledge of Jackson's involvement with the Bloods and the activities of the Bloods. As we said in *State v. DeShay,* "[t]his first-hand knowledge testimony is how the state can and should go about proving the essential elements of this crime." 669 N.W.2d 878, 886 (Minn.2003).

Finally, if the court does not narrow the scope of admissible gang expert testimony as outlined in this concurring opinion, then I suggest that the court, in the exercise of its supervisory powers, specify that, with the consent of the defendant, the charge of first-degree murder for the benefit of a gang be bifurcated for trial from the charge of first-degree premeditated murder, and the charge of second-degree murder for the benefit of a gang be bifurcated for trial from the charge of second-degree intentional murder, in order to prevent the unfair prejudice that the character and other crime aspects of gang evidence may have on the jury's evaluation of the evidence concerning a defendant's guilt for the underlying crimes.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Hanson.

MEYER, Justice (concurring).

I join in the concurrence of Justice Hanson.